George T. ARATANI et al., Appellants,

v.

Robert F. KENNEDY, Attorney General
of the United States, Appellee.

No. 16808.

United States Court of Appeals
District of Columbia Circuit.

Argued May 11, 1962.

Decided March 28, 1963.

Petition for Rehearing Denied
May 2, 1963.

Mr. Philip W. Amram, Washington, D. C., with whom Mr. Thomas H. Carolan, Washington, D. C., was on the brief, for appellants.

Mr. Armand B. DuBois, Atty., Dept. of Justice, with whom Asst. Atty. Gen. William H. Orrick, Jr., and Mr. Morton Hollander, Atty., Dept. of Justice, were on the brief, for appellee.

Before WILBUR K. MILLER, DANAHER and BASTIAN, Circuit Judges.

DANAHER, Circuit Judge.

The Office of Alien Property holds approximately $1,050,000 in account No. 39–705, net proceeds of property vested as owned by the Sumitomo Bank, Ltd., of Japan, its branches and affiliates. Our ten appellants, representing themselves and 1,134 similarly situated claimants, assert entitlement to that fund arising from prewar contractual relations with the California and Washington branches and affiliates of Sumitomo Bank, Ltd., of Japan. The Director[1] of the Office of Alien Property administratively determined that the 1,144 claimants possessed only yen obligations, payable in Japan, with interest. Appellants insisted that they were the holders of dollar obligations payable in the United States on the basis of a yen-dollar rate of exchange of 23.4 cents, which a departmental hearing examiner had found to be the dollar value of the yen as of December 8, 1941.

As authorized by the Trading with the Enemy Act, 50 U.S.C.App. § 34(f), our appellants sought review in the District Court of the Final Schedule of the Office of Alien Property dated October 24, 1958. That Schedule, pursuant to the 1957 "Decision of the Director," assigned priorities to the appellants pursuant to section 34(g) of the Act, with interest, but allowed the claims with the dollar amount to each claimant computed at the rate of only one dollar for each 361.55 yen, stipulated by the parties to be the postwar rate. That valuation was adopted by the District Judge who granted the appellee's motion for summary judgment.

The claims arose from transactions in Japanese yen between two branches and two affiliates of Sumitomo Bank, Ltd.[2] of Japan, and their customers, most of whom resided in California but with some in Seattle, Washington. For many years before December 7, 1941, the Sumitomo group accepted dollars for conversion into yen deposits in Japanese banks at the rate of exchange for selling yen prevailing at the time of each transaction. Only upon specific request of a customer was a yen certificate of deposit issued by the head office in Japan or other designated Japanese branch. The California[3] Sumitomo group issued, not certificates of deposit, but receipts for the dollar amount paid in. Each receipt reflected as converted into yen the dollar amount received from the claimant as of the date of the transaction, the name of the bank in Japan in which a deposit was to be made, the rate of interest and the term or period of the "certificate." Had the named bank of deposit in Japan actually issued its yen "certificate of deposit," the instrument in the Japanese language would provide for payment at maturity in yen upon surrender of the certificate to the bank in Japan. We find no evidence that any of the claimants here had asked for such a certificate.

I

The claimants before the examiner advanced two contentions that their claims should be allowed in the amount of dollars paid in: (1) that after

---

1. The terms Director, Custodian and Attorney General may herein be used interchangeably. The powers and functions of the Alien Property Custodian were transferred to the Attorney General by Exec. Order No. 9788, 11 Fed.Reg. 11981 (1946).

2. Involved were two California branches of Sumitomo Bank, Ltd. of Japan, which also owned the stock of Sumitomo Bank of California and of Sumitomo Bank of Seattle, both of which latter affiliates were incorporated under the laws of California and Washington, respectively. We will refer to all as the "Sumitomo group."

3. We make this special reference only because the examiner found that Sumitomo Seattle "issued to its purchasers or depositors of yen, Bills of Exchange drawn on or addressed to a specified foreign branch of Sumitomo Bank, Ltd., payable in yen at a fixed date, with interest." While the Director's Decision took note of this fact, we assume that Seattle "purchasers or depositors," comparatively few in number, have been accorded for present purposes the same status as California customers of the Sumitomo group.

receiving dollars in the United States to purchase yen in a Japanese bank, the Sumitomo group had failed to forward the funds to Japan, thus breaching their contract; and (2) that the Sumitomo group had actually accepted deposits in violation of state banking laws and by this subterfuge had become trustees ex maleficio.

The examiner's findings and conclusions to the contrary on these two aspects of the case are well supported. Were that not so, the Director's Decision in greater detail has treated of both arguments and adequately disposed of these issues. Many receipt or certificate holders were paid in yen in Japan before the outbreak of the war, indeed, the Director found that since "the end of the war several thousand yen certificates were paid in Japan by the foreign banking corporations and thousands of certificates were discharged by the issuance of postwar certificates of deposit payable in yen." (See note 6 and II, B, *infra*.)

Appellants have not here sought to demonstrate that there was error in the disposition of the first of the stipulated pre-hearing issues which was whether or not customers of the Sumitomo group were entitled to have their claims "allowed in the number of dollars deposited at the time of the purchase of the yen certificates of deposit." Accordingly we will pass to the second stipulated issue, which is really the heart of the case: granting that these appellants have valid claims against the Sumitomo group, upon what dollar basis should the claims be allowed?

## II

### A.

As to this latter issue, the examiner found that the "proper rate of exchange to be used in computing the dollar value of these claims is $.234 per yen, or 23.4 cents per yen." He based his answer on (1) "all the evidence" including the established business practice utilized and relied upon by the parties in these various exchange transactions; (2) the fact that the banks were closed on December 8, 1941, so that necessity of a formal demand was obviated; and (3) the yen on December 8, 1941 was worth $.234.[4] The examiner deemed closest in point as "ruling the present situation," Hicks v. Guinness, 269 U.S. 71, 46 S.Ct. 46, 70 L.Ed. 168 (1925). Since he regarded the effect of the transactions as calling for payment in dollars in the event of an unmet demand, and decided that demand was unnecessary because of the onset of the war, he fixed the breach as of December 8, 1941. Thus he took 23.4 cents as the proper rate to be applied.

In concluding that the custom and business practice of the parties must be considered, the examiner found it to be "clear from the record in this case that the claimants would not have bought the certificates if they did not understand that they would be paid in dollars on demand in the United States." He described the claimants[5] as middle-aged "Japanese" who were very poorly educated and had little knowledge of the English language. Having "heard and seen many of the holders of yen certificates testify in this proceeding, I was compelled to conclude that there was an understanding among all the holders of such certificates that they could be cashed in dollars at any time at the local issuing branch, and that this understanding was held and referred to by the employees of the banks with whom certificate holders came in contact. My conclusion from all the evidence is that the Japanese banks, through their American branches, sold certificates of

---

4. The examiner noted that this rate had been "agreed upon as the prewar rate by stipulation of the parties," but the Director found there was no evidence of any such "stipulation" and specifically that there could not possibly have been any such rate effective as of December 8, 1941.

5. Americans of Japanese ancestry. Apparently the claimants are largely farmers, small businessmen and servants, with the average claim running to less than $250. They were attracted to the yen certificate investment program because of the higher rate of interest offered by the Sumitomo group, the examiner found.

deposit of yen in Japan and that the contract of sale included the term that the certificates were redeemable in dollars at any time upon demand at the American branch of issue." [6]

The examiner rested his conclusion upon substantial evidence that the Japanese community generally understood that the Sumitomo receipts would be cashed at any time by the branch which had issued them. That business practice, so understood by the receipt holders as well as by the issuing bank, provided that a receipt representing a deposit in a bank in Japan would be purchased on demand by its American branch at the buying rate of exchange, dollars for yen, prevailing at the time of redemption.

The examiner thus found this case to present not at all a question of foreign exchange but one of measuring in dollars the damages to which the contracting claimants were entitled because of the breach as of December 8, 1941 by the Sumitomo group of the obligation to repurchase the receipts.[7]

## II

## B.

The Director's consolidated Decision dealt, as we have observed, with the insolvent accounts of Yokohama Specie Bank, Ltd. and Sumitomo Bank, Ltd. His text repeatedly and throughout made reference to the "Yen Certificates of Deposit," such as were actually issued by Yokohama, whereas the Sumitomo claims were based upon the receipts held by Sumitomo's American customers.[8] For our purposes we may assume that his findings and conclusions as to the Sumitomo accounts have not become suffused with a coloration derived from the evidence concerning the Yokohama claims.

Thus viewed, we read the Director's decision as holding importantly: first, that the Sumitomo claimants had acquired obligations payable only in yen in Japan; and second, there never was an obligation on the Sumitomo banks in California and Washington to repay dollars in this country, and thus the conversion of yen into dollars must be made at the rate of exchange existing on the "judgment day,"[9] November 13, 1957, the date of his decision. Accordingly, the Director found that the claimants were entitled only to a rate of 361.55 yen per dollar which the parties had stipulated to be the first rate available after the termination of hostilities.

In the foregoing respects and otherwise, the District Judge in granting summary judgment adopted the findings and conclusions of the Director. Additionally, the trial judge found that "No rate of exchange existed on the assumed breach date of December 8, 1941 and in-

---

6. The examiner's reference to certificates —such as were actually issued by Yokohama Specie Bank, Limited—must be deemed to include "receipts" such as were issued by the Sumitomo group. Counsel for the respective parties at a consolidated hearing on 3,167 claims, half of which were against Yokohama, stipulated that Sumitomo transactions were handled in the same manner as those against Yokohama.

7. In accepting 23.4¢ per yen as a yen-dollar ratio on December 8, 1941, the examiner took into account evidence of yen-dollar transactions which had occurred earlier in 1941. He looked to Sutherland v. Mayer, 271 U.S. 272, 46 S.Ct. 538, 70 L.Ed. 943 (1926) as a basis for his doing so. There the right of commercial intercourse had been restored by regulation on July 14, 1919 when there was no established rate. However the record evidence showed that three days

later "the exchange value was 7⅞ cents, which seems near enough to the designated date." Id. at 295, 46 S.Ct. at 543, 70 L.Ed. 943.

Here, the Director found that there was no such proximity in dates as to justify a finding that a December 8, 1941 valuation could be taken to be the same as that established earlier in 1941.

8. See note 6 supra.

9. The Director cited Die Deutsche Bank Filiale Nurnberg v. Humphrey, 272 U.S. 517, 47 S.Ct. 166, 71 L.Ed. 383 (1926), and Zimmermann v. Sutherland, 274 U.S. 253, 47 S.Ct. 625, 71 L.Ed. 1034 (1927). He added: "The 'Breach Day' rule supported by Hicks v. Guinness, 269 U.S. 71, 46 S.Ct. 46, 70 L.Ed. 168 (1925), under which a foreign currency obligation payable in this country is converted into dollars at the rate of exchange existing on the date of breach of the obligation, does not apply to this claim."

deed none had existed since the freezing controls under Executive Order No. 8389, as amended, became effective as to Japan on July 25, 1941 when the rate of exchange was 23.4 cents or 4.27 to the dollar."

The appellants particularly assail the conclusion of the District Judge that there "is no genuine issue as to any material fact in this case." They argue that the Director had reversed the "crucial" findings of fact of the examiner and substituted "totally divergent findings of fact of his own." Appellants contend that the District Judge fatally erred in granting summary judgment without affording them an opportunity to present additional evidence.

Section 34(f) [10] of the Trading with the Enemy Act prescribes that in a complaint for review of a schedule filed under subsection (g) the record before the District Court

"shall include the claims in question as filed, such evidence with respect thereto as may have been presented to the Custodian or introduced into the record by him, any findings or other determinations made by the Custodian with respect thereto, and the schedule prepared by the Custodian. The court may, in its discretion, take additional evidence, upon a showing that such evidence was offered to and excluded by the Custodian or could not reasonably have been adduced before him or was not available to him."

The case was argued in the District Court on May 18, 1961, and the order granting the Director's motion for summary judgment was filed July 7, 1961. On August 2, 1961, the appellants moved

that the July 7th order be vacated and that further argument be permitted or, alternatively, that appellants be allowed a reasonable time in which to file objections to the proposed findings of fact and conclusions of law submitted by the Custodian on August 1, 1961. Findings of fact and conclusions of law were entered August 2, 1961, whereupon appellants moved to vacate the orders of July 7, 1961 and August 2, 1961. In a supporting memorandum appellants claim that they had no knowledge that the court intended at the argument on the motion for summary judgment to treat the case as submitted for "full" review. Appellants represented that they "are prepared to offer to the court" documents from the Treasury Department and other sources to disclose that a rate of exchange existed between July 25, 1941 and December 7, 1941. Particularly, they insisted they "should have the opportunity to contest the proposed Findings and Conclusions." On October 2, 1961 the court entered its order denying the appellants' motion to vacate the orders of July 7 and August 2, as above, but stayed their effectiveness pending argument at a time to be set. On October 26, 1961, further proceedings were had in the course of argument at which appellants intimated their desire to "produce more evidence showing estoppel from the banks to deny—show that the banks never refused to pay one of those Sumitomo certificates * * *." [11]

Appellants filed their further memorandum setting forth in some detail the nature of the evidence upon which they would rely to demonstrate:

"On the record before him the Director should have found that the

10. The record before the District Court must present the "findings or other determinations made by the Custodian [Director]." Section 34(f); and see as to review, and dealing with pertinent identical section 34(e) language, Reissner v. Rogers, 107 U.S.App.D.C. 260, 263, 276 F.2d 506, 509, cert. denied, 364 U.S. 816, 81 S.Ct. 47, 5 L.Ed.2d 47 (1960); and International Silk Guild v. Rogers, 104

U.S.App.D.C. 330, 335, 262 F.2d 219, 224 (1958).

11. In view of our disposition of the case as treated in Part III infra, we need not stop to consider in detail questions such as the claimed inadequacy of appellants' proffer or the trial judge's exercise of "discretion" with respect to receiving additional evidence. As to the review authority see note 9 supra.

deposits were payable at the American branches or affiliates on demand
and

"The Director should have further found that the closing of the American branches or affiliates on December 8, 1941, constituted a breach making a demand unnecessary."

■ We see no necessity for further consideration of appellants' first point. We will accord to the appellants the full benefit of our conclusion that the examiner correctly found that the contract between the Sumitomo claimants and the Sumitomo group included an obligation on the part of the banks to redeem in dollars the outstanding yen receipts. There was established thus, in our view, an obligation in the United States [12] to pay American claimants in dollars, as well as the alternative obligation to honor the receipts in Japan had they been presented there.

### III

Accordingly, taking the view we have discussed, we pass to consideration of what follows from appellants' argument that demand was unnecessary because the American entities in the Sumitomo group had been closed [13] as a consequence of the outbreak of war. Appellants assert the District Court erroneously precluded them from showing (1) that there was a rate of exchange ascertainable as of December 8, 1941, and (2) that the rate was 23.4 cents per yen. Since the Director found against them on both points, appellants argue that there was a genuine issue of material fact.

At the risk of repetition, we quickly restate the substance of the positions, respectively found and asserted. The Director found to be untenable the claimants' position that the rate of 23.4 cents

per yen, established as the rate of July 25, 1941, continued to prevail as of December 8, 1941. He noted that no rate of exchange was quoted by the Federal Reserve Board after that of July 25, 1941. Appellants insist that the Director should have followed the lead of the examiner who after concluding that a demand was unnecessary, accepted what he said had been the agreed prewar rate of 23.4 cents per yen.

Appellants had claimed before the trial judge that there was in fact a fixed rate of exchange on what the examiner had called "breach day," and that according to a letter dated January 19, 1956, written by the manager of the Foreign Division of the Union Bank and Trust Company of Los Angeles, a financial institution in Switzerland had reported that in transactions involving yen and dollars on December 8, 1941, the ratio was 23.4 cents per yen. They also had urged that United States Treasury documents would show, based upon reports of the Federal Reserve Bank of New York, a rate of exchange between dollars and yen continued through the month of August 1941. In addition to such evidence, here summarized, appellants had pointed out that the Office of Alien Property in 1947 had itself asserted a claim for dollars based upon a Sumitomo bank receipt, and that the rate predicating the claim was taken at 23.4 cents per yen. Thus, they argue to us on brief, "If the Office of Alien Property standing in the shoes of an enemy National can assert a claim based upon the same type of obligation as plaintiffs and ask for dollars at the rate of 23.4 cents per year [sic] yen, then in all fairness and equity a qualified non-enemy National or citizen of the United States should have the same right." [14]

---

12. Cf. Deutsche Bank and Zimmermann cases, supra note 9, re prewar debts due and payable only in foreign countries.

13. The American branches were never reopened. We agree that demand by the American claimants was unnecessary.

14. The claim referred to had followed an order, issued by the Office of Alien Prop-

erty on March 9, 1944 and revoked December 19, 1952, reading in part as follows:

"§ 503.30  General Order No. 30

"(a) That for the purpose and solely for the purposes of discharging claims and rights of foreign countries and nationals thereof against citi-

Appellants are seeking to bring themselves within the ruling in Hicks v. Guinness[15] where a debt on an account stated as of December 31, 1916, due to an American creditor of a German firm, was to be paid in the United States. But Mr. Justice Holmes pointed out: "The cause of action had accrued *before* the war began, Young v. Godbe, 15 Wall. 562 [21 L.Ed. 250], and after it had accrued the question was *no longer* one of excuse for not performing a contract, but of the continuance of a liability for damages that had become fixed."[16] (Emphasis supplied.) Here, the obligation of Sumitomo Bank, Ltd. to purchase through its American branches and affiliates, the receipts held by their American customers was valid as of December 8, 1941, and demand was unnecessary, as we have seen. But appellants then were bound to meet the "excuse for not performing" the contract, to which aspect we will presently turn.

The appellants urge here, as they did before the examiner and the Director and in the District Court, that conversion of the dollars in the hands of the American Sumitomo group was possible on the basis of the yen-dollar relationship as of December 8, 1941, to be established from such evidence as we have summarized above. They complain that the Director erred on the facts when he found that Sumitomo was bound to pay only in yen, in Japan, and on the law when he concluded that only the postwar rate of exchange must here be allowed. They contend that in accepting the Director's position, the District Judge likewise erred, and additionally in that he denied them an opportunity to demonstrate that on December 8, 1941 a rate of 23.4 cents per yen existed, payable in dollars here.

We say at once, we find no error in the District Court's ultimate conclusion[17] that appellants' claims were to be measured at the rate of 361.55 yen per dollar.

## IV

■ At this point we may note the anomaly of the appellants' position. Even as they have argued that demand was unnecessary because of the outbreak of the war, they have failed[18] to recognize that "all intercourse, correspondence and traffic between citizens of this country and of [Japan], which would or might be to the advantage of the enemy, were absolutely forbidden."[19]

We find no basis for a conclusion that the appellants were wrongfully precluded from showing that a yen-dollar ex-

---

zens and residents of the United States which by contract or agreement made or entered into by the parties prior to vesting are dischargeable by payment in monetary units of certain enemy countries and which have heretofore been or shall hereafter be vested by the undersigned, the equivalent of the monetary units of such enemy countries shall be computed as follows:

\* \* \* \* \*

"(2) Japanese Yen at twenty three and four tenths (23.4) cents United States currency, each \* \* \*." (Emphasis added.)

15. 269 U.S. 71, 80, 46 S.Ct. 46, 70 L.Ed. 168 (1925).

16. Id. at 81, 46 S.Ct. at 47, 70 L.Ed. 168.

17. Since he had decided that appellants held yen claims, payable only in Japan, he relied upon Die Deutsche Bank Filiale Nurnberg v. Humphrey, 272 U.S. 517, 47 S.Ct. 166, 71 L.Ed. 383 (1926), where

at the date of demand the German bank owed no duty arising under our law to an American depositor.

18. We quote from the appellants' reply brief:

"Except for the fact that the American branches, Japanese owned and controlled, had been blocked, the situation on December 8, 1941, was the same as it had been for 25 years, an all-American contract, whereby depositors in America placed dollars on savings with American branches of a Japanese bank, with the understanding of all concerned that such savings would be repaid in dollars on demand in America."

But then came the war!

19. Sutherland v. Mayer, 271 U.S. 272, 286, 46 S.Ct. 538, 539–540, 70 L.Ed. 943 (1926). Of course, the Supreme Court there was speaking of commercial intercourse across enemy lines, but like disability arose here under the circumstances to be discussed.

change ratio prevailed up to December 7, 1941, or a date reasonably proximate thereto.[20] That such a rate may have existed is immaterial, for what we next say is dispositive of the case.

Appellants have not met and can not avoid the unalterable fact that in the United States, Sumitomo's branches and affiliates were powerless to honor the parent bank's commitment to redeem in dollars. The course of the law and the orders of the sovereign prevented performance and confronted the appellants with "an ineluctable consequence of the war." [21]

The Trading with the Enemy Act, as amended, not only authorized the President to "prohibit" any transactions in foreign exchange, but Congress expressly approved [22] Executive Order No. 8389 [23] and ratified official actions taken pursuant thereto. The President accordingly, on July 26, 1941, effective as of June 14, 1941, extended Executive Order No. 8389 to Japan.[24] Agreeably thereto, the Secretary of the Treasury issued General License No. 69,[25] under which Sumitomo Bank of California and Sumitomo Bank of Seattle became "generally licensed nationals."

But whatever status might thus have been accorded to the Sumitomo group up to the Pearl Harbor attack on December 7, 1941, the Treasury Department by Public Circular No. 8 [26] revoked all "general licenses, specific licenses, and au-

thorizations of whatsoever character" insofar as they might earlier have authorized "directly or indirectly" any transaction by, on behalf of, or for the benefit of Japan or any Japanese national.

On the record before us, it is shown, and the Hearing Examiner found:

"On December 7, 1941 agents of the United States Treasury Department seized the American branches of the Japanese banks and locked their doors so that they were unable to open for business thereafter. The state banking authorities then stepped in as conservators and liquidators of the American branches in their respective jurisdictions and were permitted to proceed with the liquidation of the branches and pay all the local depositors and creditors. A few holders of Yen Certificates of Deposit attempted to file claims with one of the liquidators and a few attempted to intervene in the distribution of dividends in the state court, but these claims were rejected and intervention was not allowed by the state court."

In like vein the Custodian found:

"On December 8, 1941, Superintendent of Banks of the State of California took possession of the California branches of * * * Sumitomo Bank, Ltd., and of the Sumitomo Bank of California, pur-

20. It would seem beyond doubt that the prewar July and August rate of 23.4 cents per yen did not, overnight, deteriorate to 361.55 per dollar. Important factors bearing on the market were United States controls imposed pursuant to Exec.Order No. 8389, infra, and Japanese controls on transactions with American nationals imposed by Ministry of Finance Order No. 46, July 28, 1941. We have not been pointed to any transactions here involved which were entered into thereafter.

21. Sutherland v. Mayer, supra note 19, 271 U.S. at 292, 46 S.Ct. at 542, 70 L.Ed. 943.

22. 54 Stat. 179.

23. 5 Fed.Reg. 1400 (1940); see 12 U.S.C. § 95a.

24. Exec.Order No. 8832, 6 Fed.Reg. 3715 (1941). Thus as to Japan, transactions in foreign exchange were prohibited within the United States except under specific authorization by the Secretary of the Treasury.

25. 6 Fed.Reg. 3726 (1941). Actions of the President and the Secretary of the Treasury were further approved and confirmed by the First War Powers Act of 1941, § 302, 55 Stat. 839.

26. 6 Fed.Reg. 6304 (1941).

suant to the provisions of the California Bank Act. The Sumitomo Bank of Seattle * * * came under control of the United States Treasury Department at the outbreak of war. None of the United States banks opened for business on or after December 8, 1941."

Thus, with the appellant receipt holders entitled at their option, to payment in dollars in the United States, the obligations of Sumitomo persisted but the remedy of the receipt holders was postponed. Only postwar relief remained, for the Sumitomo American branches and affiliates had been closed and their assets sequestered, first in the hands of the state liquidation officers, and finally of the Alien Property Custodian.

The statutory pattern created by the Congress, coupled with the administrative orders made with due authority by the officers of our Government, and the facts as found, present an adequate excuse [27] for the failure of the Sumitomo group to perform so much of the contract as called for the redemption in the United States of the outstanding yen receipts. By force of such circumstances, redemption of the receipts held by the appellants could have been achieved only in Japan. Since commercial intercourse with Japan was completely prohibited because of the war,[28] the rate of exchange at which the yen obligations could be converted into dollars would be the first rate available after the termination of hostilities.[29]

The Director, in the view he took of the problem but upon a different basis, arrived at a like result, and so did the District Court in adopting the Director's position. The latter found, correctly we think, that since each receipt had provided for interest at a fixed rate from the date of issue, interest flowing from the contract before the outbreak of hostilities continued to run.[30] Thus he awarded "contractual interest" in accordance with the provisions of and at the rate agreed upon in each individual receipt until payment of the principal. Payments of both principal and interest are to be at the same rate of exchange, the stipulated postwar rate of 361.55 yen per dollar.

We have not failed to consider Kiyoichi Fujikawa v. Sunrise Soda Water Works Co.[31] There the Pacific Bank, organized under the laws of the Territory of Hawaii, did business only in Honolulu. Unlike Sumitomo Bank, Ltd. of Japan or Yokohama Specie Bank, Ltd., Japanese corporations owned by citizens of Japan residing in Japan, the Pacific Bank was owned by stockholders in Honolulu. No question of exchange was presented. Rather, its officers and directors sought no license to do business after December 7, 1941 although other financial institutions similarly situated received licenses to continue. The Pacific Bank, although completely solvent, was closed on December 7, 1941 and was allowed to remain closed until October 27, 1942, when liquidation was commenced pursuant to the duly authorized order of the Governor of the Territory of Hawaii.

The District Court had concluded that the officers and directors had neglected and failed in the duty impressed upon

27. Compare our conclusion with the rule pronounced by Judge Hand in Global Commerce Corp. v. Clark-Babbitt Industries, and cases cited, 239 F.2d 716, 720 (2 Cir., 1956).

28. Ex parte Kawato, 317 U.S. 69, 76, 63 S.Ct. 115, 87 L.Ed. 58 (1942).

29. Sutherland v. Mayer, supra note 19; International Silk Guild v. Rogers, supra note 10.

30. Brownell v. Bank of America Nat. Trust & Sav. Ass'n, 94 U.S.App.D.C. 206, 214 F.2d 855, cert. denied, 348 U.S. 864, 75 S.Ct. 89, 99 L.Ed. 681 (1954).

31. 158 F.2d 490 (9 Cir., 1946), cert. denied, 331 U.S. 832, 67 S.Ct. 1511, 91 L.Ed. 1846, rehearing denied, 332 U.S. 785, 68 S.Ct. 31, 92 L.Ed. 368 (1947). The action did not arise under the Trading with the Enemy Act, and the Attorney General did not join in the petition for certiorari.

them to search avenues for obtaining relief. The Court of Appeals decided that Pacific Bank stockholders in seeking to resist payment of interest [32] to the depositors and creditors whose claims had been allowed 100 per cent, had failed to show that the District Court erred in finding that performance was possible.

In Paramount Pictures v. Clark a state trial court, without opinion, allowed interest to depositors in the Yokohama Specie Bank, Ltd. on claims as to which no controversy was raised, which fell due on or about December 6, 1941. A California district court of appeal affirmed [33] quoting extensively from the Fujikawa opinion.[34] As in that case, the appellate court deemed itself bound by the inferences and conclusions reached by the trial court, particularly with respect to an absence of adequate showing of "good faith" for exculpation of the bank's officers from liability within the meaning of section 5(b) (2) of the Trading with the Enemy Act.

The respondent's brief in the Supreme Court [35] pointed out that the Treasury Department, as of December 27, 1941, issued licenses to the California Superintendent of Banks authorizing payments to depositors; California law then required him to pay interest on allowed claims; and the Attorney General had vested only excess proceeds of the Yokohama Bank's business after payment of claims established pursuant to the law of California.

We cannot know the precise grounds upon which the denial of certiorari was based. It is clear, however, that the Paramount case is distinguishable on its facts and is not to be accepted as controlling here. Suffice it to say, the Sumitomo California group had not been authorized to accept deposits, the Washington Sumitomo bank had issued bills of exchange,[36] our appellants had entered into foreign exchange transactions, and neither the California nor the Washington Sumitomo banks reopened "for business on or after December 8, 1941."

We have sympathetically and painstakingly explored the complicated record before us. We have found no basis upon which to conclude that these appellants now are entitled to receive dollars for their yen receipts at any rate of exchange except that which prevailed when commercial intercourse first became lawful in the postwar period.[37] In this view and for the reasons stated, we find no error which requires reversal of the judgment of the District Court

Affirmed.

---

32. Here interest has been allowed. See note 30 supra, and pertinent text.

33. 93 Cal.App.2d 768, 209 P.2d 968 (1949). The California Supreme Court without opinion denied hearing on petitions by the State Superintendent of Banks and the Attorney General of the United States. Certiorari was denied sub nom. McGrath v. Paramount Pictures, Inc., 339 U.S. 953, 70 S.Ct. 838, 94 L.Ed. 1366 (1950).

34. Supra note 31.

35. 339 U.S. Supreme Court, Records and Briefs, Nos. 594 and 613 (Oct. Term, 1949).

36. Cf. Kerr S.S. Co. v. Chartered Bank of India, Etc., 292 N.Y. 253, 54 N.E.2d 813 (1944); as to "impossibility," see generally, 6 Corbin, Contracts 416–497.

37. Sutherland v. Mayer, supra note 19, 271 U.S. at 295, 46 S.Ct. at 542–543, 70 L.Ed. 943.