Beatrice Antonette **TRAMONTANA**, Appellant,

v.

**S. A. EMPRESA DE VIACAO AEREA RIO GRANDENSE**, a Brazilian Corporation, t/a **Varig Airlines**, Appellee.

No. 18277.

United States Court of Appeals District of Columbia Circuit.

Argued Oct. 7, 1964.

Decided June 10, 1965.

Petition for Rehearing En Banc Denied Oct. 4, 1965.

Mr. Eugene Gressman, Washington, D. C., with whom Messrs. Hyman Smollar, Ronald Rosenberg and George Kaufmann Washington, D. C., were on the brief, for appellant.

Mr. John L. Laskey, Washington, D. C., with whom Mr. Harry A. Bowen, Washington, D. C., was on the brief, for appellee.

Before FAHY, DANAHER and McGOW-AN, Circuit Judges.

McGOWAN, Circuit Judge:

This appeal presents an international variant of a recurring domestic conflict of laws problem, namely, the applicability in the forum (the District of Columbia) of a monetary damage limitation contained in the wrongful death statute of the place of injury (Brazil). We have, thus, no concern with the Full Faith

and Credit Clause of the Constitution, nor is it claimed that any international engagement of the United States compels recognition of the foreign law. On the record before us, however, we do not find that the District Court erred in according such recognition; and we affirm its judgment.

## I

Vincent Tramontana was killed on February 26, 1960, when the United States Navy airplane in which he was traveling on naval orders collided over Rio de Janeiro, Brazil, with an airplane owned and operated by a Brazilian airline.[1] At the time of his death, Tramontant was a member of the United States Navy Band, which was on an official tour of Latin America. The record does not show his permanent duty station, but he resided with his wife, appellant here, in Hyattsville, Maryland. The Navy plane in which he was travelling when he was killed was en route from Buenos Aires in Argentina to Galeao, Brazil. Appellee Varig Airlines is a Brazilian corporation having its principal place of business in Brazil but carrying on its transportation activities in many parts of the world, including the United States. The Brazilian plane was on a regularly scheduled commercial flight from Campos, Brazil, to Rio de Janeiro when the accident occurred.

Almost two years after her husband's death, appellant instituted this action in the District Court against Varig and its predecessor, alleging that negligence in the operation of the Brazilian plane had caused her husband's death. She explicitly based her claim for recovery on certain provisions of the Brazilian Code of the Air which provide a cause of action for injury or death resulting from negligent operation of aircraft in Brazil. She claimed damages of $250,000. Service was made on Varig Airlines, which concededly is subject to suit in the District of Columbia.[2] Varig filed an answer to appellant's amended complaint and the same day moved for summary judgment dismissing the complaint or, in the alternative, for summary judgment in respect of so much of appellant's claim as exceeded the U. S. dollar equivalent of 100,000 Brazilian cruzeiros. Varig relied on Article 102 of the Brazilian Code, which limits liability for injury or death in aviation accidents to that amount. The District Court, with Varig's consent, entered judgment in favor of appellant in the amount of $170.00, the current dollar value of 100,000 cruzeiros. It awarded judgment in favor of Varig "for all of the plaintiff's claim which exceeds the sum of One Hundred Seventy Dollars ($170.00)." From this latter judgment Mrs. Tramontana appealed.[3]

1. The Brazilian plane was, at the time of the accident, owned and operated by Real S. E. Transportes Aeros, a Brazilian corporation, appellee's assignor. Appellee, however, does not contest its status as Real's successor in interest or otherwise disclaim liability on this ground. For convenience, appellee is sometimes referred to hereinafter as the owner and operator of the plane at the time of the collision.

2. Appellant based jurisdiction on 11 D.C. Code § 306, now, in amended version, 11 D.C.Code § 521(a), which conferred on the United States District Court for the District of Columbia jurisdiction of "all cases in law and equity between parties, both or either of which shall be resident or be found within said district." Service of process upon Real was quashed on the ground that that company was not

doing business within the District of Columbia. See 13 D.C.Code § 334(a), formerly 13 D.C.Code § 103.

3. Seventeen other members of the Navy Band perished in the collision. They are represented in two other actions in the District Court, one involving eleven plaintiffs, the other, six. Appellee had summary judgment on the same terms in both suits. Only appellant has appealed. The other two cases have been ordered "stayed pending final disposition of any appeal taken in the case of Beatrice Antonette Tramontana v. S. A. Empresa De Viacao Aerea Rio Grandense, t/a Varig Airlines, Civil Action No. 637–62 in this Court, counsel having stipulated that the final ruling in said case will be controlling herein." Of the seventeen other plaintiffs in these two suits, two, and perhaps three, were listed as residents of the Dis-

## II

The only question now before us is whether Brazil's limitation on the damages recoverable for death sustained in airplane accidents occurring there is to be applied in this suit in the District of Columbia. Appellant appears to concede that her cause of action, if any, was created by, and arises under, a provision of Brazilian law enacted coincidentally and in conjunction with the damage limitation. She argues, however, that the forum law regarding damages for wrongful death occurring in the District of Columbia, *i. e.*, unlimited recovery, should govern that aspect of her claim. Initially, she accepts the applicability of the traditional conflict of laws rule in personal injury cases that the *lex locus delicti*, the law of the place where the injury occurred, generally governs in a suit brought elsewhere, but she asserts that a court sitting in the District of Columbia should adopt the familiar exception to the effect that the forum will refuse to apply the otherwise applicable foreign law if it is contrary to some strong public policy of the forum. Appellant asserts the existence of a strong policy of the District of Columbia in favor of unlimited recovery for wrongful death, which she claims is evidenced by Congress' repeal in 1948 of the $10,000 maximum until then contained in the local wrongful death statute.[4] She points also the fact that only thirteen states still limit recovery for wrongful death, and that none imposes a ceiling as low as that contained in the Brazilian Air Code. She cites the Warsaw Convention, which governs generally accidents involving international air carriers and which now permits recovery up to $8,292, as constituting in essence an international standard of fairness in such matters.[5] And, finally, she relies on the New York Court of Appeals decision in Kilberg v. Northeast Airlines, Inc., 9 N.Y.2d 34, 211 N.Y.S.2d 133, 172 N.E.2d 526 (1961), as a persuasive prece-

trict of Columbia, eight as residents of Maryland, and the remainder as residents of other states. We, of course, decide only the case before us, which involves a non-resident appellant suing in respect of the death of a non-resident decedent. A tactical decision by counsel to stipulate that the result of this appeal shall apply in cases not on appeal does not enlarge the record before us.

After this appeal was heard, the Court of Claims of the United States, pursuant to a reference by Congress, recommended an award of $25,000 to the families of each of these eighteen decedents. Armiger et al. Estates v. United States, 339 F.2d 625 (Ct.Cl.1964). This recommendation was founded on purely equitable grounds, and rested upon the circumstance that, prior to the fatal flight, there had been a failure to follow the usual practice of distributing application forms for private flight insurance. The possibility of suit against the United States under the Federal Tort Claims Act is precluded by that statute's express exclusion of claims "arising in a foreign country." 28 U.S.C. § 2680(k).

4. 16 D.C.Code § 2701 was amended in 1948, 62 Stat. 487, eliminating the $10,000 ceiling on damages recoverable for wrongful death. As amended, it provides in relevant part:

When, by an injury done or happening within the limits of the District, the death of a person is caused by the wrongful act, neglect, or default of a person or corporation, and the act, neglect, or default is such as will, if death does not ensue, entitle the person injured, or if the person injured is a married woman, entitle her husband, either separately or by joining with the wife, to maintain an action and recover damages, the person who or corporation that is liable if death does not ensue is liable to an action for damages for the death, notwithstanding the death of the person injured, even though the death is caused under circumstances that constitute a felony.

The damages shall be assessed with reference to the injury resulting from the act, neglect, or default causing the death, to the spouse and the next of kin of the deceased person; and shall include the reasonable expenses of last illness and burial. * * *

5. Both Brazil and the United States are signatories to the Convention, but its coverage is limited in terms to claims by or on behalf of passengers of the carrier against which recovery is sought.

dent for the position she urges us to adopt. Another contention, which we treat separately hereinafter, is that the Brazilian limitation should be disregarded because of the striking decline which has taken place in the value of the cruzeiro in terms of the dollar.

Appellant's essential effort throughout is to urge us to follow the "newer and more realistic judicial approach" to conflict of laws problems exemplified by *Kilberg* and Babcock v. Jackson, 12 N.Y.2d 473, 240 N.Y.S.2d 743, 191 N.E.2d 279, 95 A.L.R.2d 1 (1963), and more recent decisions of the Supreme Court, and to reject the assertedly outmoded and discredited teaching of Slater v. Mexican Nat'l R. R., 194 U.S. 120, 24 S.Ct. 581, 48 L.Ed. 900 (1904), and kindred decisions. Under the test we are asked to employ, the choice of law to be applied to each legal issue presented is to be made in light of the jurisdiction which has the strongest interest in the resolution of that issue." Appellant's Brief, p. 10. "Emphasis is [to be] placed * * * upon the law of the place which has the most significant contacts with the matter in dispute." *Id.* at 26. A cornerstone of this newer thinking, appellant contends, is the forum's reluctance to subordinate its policies to those of another state when its own interest in the case is real and substantial.

■ The Supreme Court, in its decisions in Richards v. United States, 369 U.S. 1, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962), and many earlier cases,[6] has recognized the inadequacies of the theoretical underpinnings of *Slater* and its progeny. The latter cases have a highly attenuated precedential weight, both in authority and reason.[7] Thus we are free to explore the question presented by this appeal in the light of the newer concepts of conflict of laws. Our conclusion that the District Court properly applied the Brazilian limitation rests upon an examination of the respective relationships of Brazil and the District of Columbia with the accident, and with the parties here involved; and a consideration of their respective interests in the resolution of this issue.

The interest underlying the application of Brazilian law seems to us to outweigh any interest of the District of Columbia. Not only is Brazil the scene of the fatal collision, but Varig is a Brazilian corporation which, as a national airline, is an object of concern in terms of national policy. To Brazil, the success of this enterprise is a matter not only of pride and commercial well-being, but perhaps even of national security. The limitation on recovery against airlines operating in Brazil was enacted in the early days of commercial aviation,[8] no doubt with a view toward protecting what was then, and still is, an infant industry of extraordinary public and national importance. The Brazilian limitation in terms applies only to airplane accidents, unlike the Massachusetts provision rejected in *Kilberg*, which was an across-the-board ceiling on recovery for wrongful death in that state. The focus of Brazilian concern could hardly be clearer.

6. *E.g.*, Watson v. Employers Liability Assur. Corp., 348 U.S. 66, 72, 75 S.Ct. 166, 99 L.Ed. 74 (1954); Vanston Bondholders Protective Comm. v. Green, 329 U.S. 156, 160–162, 67 S.Ct. 237, 91 L.Ed. 162 (1946); Alaska Packers Ass'n v. Industrial Acc. Comm'n, 294 U.S. 532, 55 S.Ct. 518, 79 L.Ed. 1044 (1935). See generally Currie, *The Constitution and the Choice of Law: Governmental Interests and the Judicial Function*, 26 U.Chi.L.Rev. 9, 75–84 (1958).

7. See, *e.g.*, Babcock v. Jackson, 12 N.Y.2d 473, 240 N.Y.S.2d 743, 191 N.E.2d 279, 95 A.L.R.2d 1 (1963); Cavers, *A Critique of the Choice-of-Law Problem*, 47 Harv.L.Rev. 173, 178 (1933); Cheatham, *American Theories of Conflict of Laws: Their Role and Utility*, 58 Harv.L.Rev. 361, 379–85 (1945); Yntema, *The Hornbook Method and the Conflict of Laws*, 37 Yale L.J. 468, 474 et seq. (1928).

8. The Brazilian Code of the Air, including Article 102, was enacted in 1938. Air transportation has become increasingly important in Brazil, both because of the size of the country, and because of the relative inadequacy of surface transportation.

We have seen nothing that would suggest that Brazil's concern for the financial integrity of her local airlines should be deemed to be less genuine now than when Article 102 was enacted, simply because of the depreciation of the cruzeiro. The failure to amend that provision may reflect a conscious desire to avoid enlarging the potential liability of local airlines during a period of general economic difficulty. It may represent an unwillingness to contribute to the inflationary spiral by adjusting "prices" fixed by statute, which the government can control. Or it may be attributable in part to both motives. In any event, we are not persuaded that the fact of inflation itself—with the result that 100,000 cruzeiros are worth now considerably less than when the limitation was enacted—should be deemed to render obsolete Brazil's legitimate interest in limiting recoveries against her airlines.

Appellant relies primarily on the New York Court of Appeals decision in Kilberg v. Northeast Airlines, Inc., *supra*, as a precedent for the course she asks us to follow. A close analysis of that court's reasoning reveals that the relationships and interests, which it thought compelled the result reached, do not parallel those here. The decedent in *Kilberg* was both a resident and a domiciliary of New York. He was a paying passenger on the defendant airline, which relationship had originated in New York. As the Court of Appeals pointed out, once on board the plane the place of the injury was merely "fortuitous." New York's long-standing policy in favor of unlimited

recovery in actions for wrongful death coalesced in this case with its real and immediate interest in providing full compensation for the death of one of its own citizens. And its interest would have been the same whether the defendant's aircraft had crashed in New York, in Long Island Sound, or, as it did, in Massachusetts.

In the case before us neither appellant, her children, nor her husband were or are resident or domiciled in the District of Columbia. Vincent Tramontana was not a passenger on appellee's plane, and his "relationship" with appellee commenced and ended in Brazil in one shattering moment. The place of injury, under these circumstances, was clearly not fortuitous, although the accident was something of a freak. Vincent Tramontana could not have been killed by Varig's Campos-to-Rio flight except in Brazil. To suggest that he might have been killed here in the District, or in Maryland, by one of Varig's international flights is to ignore the facts of this case.[9] It is one thing to say that airlines should not be the beneficiaries, nor their passengers the victims, of the vagaries of weather and faulty equipment that cause an aircraft to crash in one jurisdiction rather than another. It is quite another to say that an American traveler, who is injured in Brazil through the negligence of the operator of a local airline on which he was not a passenger and with which he had no previous connection, is entitled to the benefit of the law of a forum which is not his home, because its successor happens to do business there.[10]

9. The possible locations of Varig's wrongdoing, if such it was, are irrelevant to the determination of which law should measure appellant's recovery except insofar as they have some other connection with the parties or the accident, or some independent interest in the resolution of this issue. If the mere possibility, however remote, that Vincent Tramontana might have been killed through some negligence of appellee in the District of Columbia were thought to give the District some interest in the application of its law, whatever predictability remains in the conflict of laws of torts would disap-

pear. Concededly, predictability is a depreciated coin in tort law, see Babcock v. Jackson, 12 N.Y.2d 473, 478, 240 N.Y.S.2d 743, 746–747, 191 N.E.2d 279, 281 (1963), but it still retains some value. Varig's ability to predict and obtain the cost of insurance, for example, may depend to some extent on its ability to estimate its potential liability. Compare EHRENZWEIG, CONFLICT OF LAWS, § 213, at 555 (1962).

10. The presentation to us of this appeal by both parties was depressingly devoted almost entirely to a discussion of the

The District of Columbia's connection with the occurrence and with the parties, and its interest in the resolution of the issue before us, are, if not wholly remote, certainly less than Brazil's. Neither appellant nor her decedent are or were residents of the District of Columbia. Varig Airlines is subject to suit here only because of the international operations in which it is engaged. Whatever negligence it may have been guilty of assuredly did not occur here, nor, manifestly, did the decedent's death. If appellant and her children should ever become public charges, the burden will rest not on the District of Columbia but on the citizens of Maryland, where appellant resides.[11]

Although Maryland, the state of the decedent's and appellant's residence, might be thought to have a substantial interest in the amount recoverable for his death, no suggestion has been made that we should apply the law of Maryland to determine the issue before us.[12] But this possibility inevitably suggests itself, and we therefore are inclined to say why we think that, even as between the law of Maryland and the law of Brazil, we are without warrant to look to the former. In striking this balance, the weight to be accorded the interests of Brazil remains unchanged. The question is whether Maryland has a significantly greater claim to the application of its law than' the District of Columbia. Maryland's only relationship with the parties or the transaction is that it is appellant's residence, and was that of the decedent, but its interest in the matter of appellant's recovery is not insignificant, for it is on the citizens of Maryland that the burden of her support, if she is unable to support herself, is likely to fall in the first instance.[13] Yet it appears likely that a Maryland court would not

---

merits of *Kilberg*. Actually, the resemblance of this case to *Kilberg* begins and ends with the circumstance that death in each case occurred while in flight. Decision of this case involves a great deal more than measuring one's respect for the memory of Professor Beale by means of one's attitude towards *Kilberg*. The case before us is much the same as if a resident of the State of Maryland, while on a summer vacation trip to Europe and while crossing the street in Amsterdam, were run over and killed by a beer truck making a local delivery. If Holland had a wrongful death act with a limitation on damages, and if the brewing company had a sales office in the District of Columbia, then a suit in the District by the Maryland widow would present us with a problem virtually identical with that we now have. The increasing international mobility of both ordinary citizens and business enterprises suggests that the issue is an important one already and is likely to become more so. There are obvious implications to be considered in respect of the degree of comity which should obtain between sovereign nations unrestrained by a full faith and credit clause in a world constitution.

11. The New York Court of Appeals' dominating concern in *Kilberg* was to ensure "protection for *our own State's people* against unfair and anchronistic treatment of the lawsuits which result from these [airline] disasters." 9 N.Y.2d at 39, 211 N.Y.S.2d at 135, 172 N.E. at 527–528. The immediate objects of that concern were, of course, the victims and their dependents. The implicit assumption, however, was that if protection were not provided them, the cost of their support might have to be borne by the state and citizens of New York. The District of Columbia may have an altruistic interest in seeing that the survivors of residents of nearby states do not go uncompensated, but it faces no additional burden if compensation is not provided.

12. Neither in her brief nor at the oral argument did appellant urge us to consider any other alternative than the application of District of Columbia law. Her failure to rely, at least in the alternative, on the law of Maryland, the state of her residence, as well as that of her husband's may be at least in part attributable to the fact that at least some of the eighteen plaintiffs appear to reside in states which have damage limitations in their wrongful death acts. It is more likely due to counsel's awareness of what appears hereinafter with respect to the state of Maryland law in this area.

13. As noted above, this burden has, by reason of the action of Congress and the Court of Claims, been assumed to some degree by the citizens of the entire United States.

have ignored the Brazilian limitation on recovery if this action had been brought there originally.

Section 2 of Maryland's wrongful death statute provides that, in suits based on acts committed outside the state,

the courts of this State shall apply the law of such other state, District of Columbia or territory of the United States, to the facts of the particular case, *as though such foreign law were the law of this State,* provided, however, that the rules of pleading and procedure effective in the court of this State in which the action is pending govern and be so applied as to give effect to the rights and obligations created by and existing under the laws of the foreign jurisdiction in which the wrongful act, neglect or default occurred * * *.

MD.ANN.CODE, art. 67, § 2 (1957). (Emphasis added.) This provision was enacted in 1937 specifically to overrule several Maryland cases refusing to entertain suits for wrongful death based on foreign wrongful death acts that were "dissimilar" to the Maryland statute.[14] The Maryland courts previously appeared

to accept the traditional *lex locus delicti* rule in personal injury cases. The new section, far from changing this allegiance, invested it with statutory authority.[15] It opened the Maryland courts to suits based on a foreign law, regardless of its content, and instructed the courts to give effect to each and every substantive element of that law. The result was to expose Maryland residents to suit at home for acts committed outside the state, with the survivors of Maryland residents killed away from home dependent upon foreign law for any rights of recovery.

The Maryland Court of Appeals has held that, where both accident and death occurred in another state, the defendant's liability—and thus the plaintiff's right to recover—depends on the law of that state.[16] It has not had an opportunity to consider whether the amount of damages recoverable is an element of that right, but it is speculative in the extreme for us to infer that it would hold it to be otherwise. The amount of damages recoverable for a tort is, in traditional theory, a matter of substantive law. The New York Court of

---

14. See, *e.g.*, Davis v. Ruzicka, 170 Md. 112, 183 A. 569 (1936); London Guarantee & Acc. Co. v. Balgowan S.S. Co., 161 Md. 145, 155 A. 334, 77 A.L.R. 1302 (1931); Dronenburg v. Harris, 108 Md. 597, 71 A. 81 (1908); Ash v. Baltimore & O. R.R., 72 Md. 144, 19 A. 643 (1890). See also Kaufmann v. Service Trucking Co., 139 F.Supp. 1 (D.Md.1956). Prior to Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), however, the federal courts in Maryland did permit such suits. See, *e.g.*, Stewart v. Baltimore & O. R.R., 168 U.S. 445, 18 S.Ct. 105, 42 L.Ed. 537 (1897); Weissengoff v. Davis, 260 F. 16 (4th Cir. 1919); Rose v. Phillips Packing Co., 21 F.Supp. 485 (D.Md.1937).

15. See Kaufmann v. Service Trucking Co., *supra*, note 14, 139 F.Supp. at 5; 50 VA. L.REV. 353, 364 n. 51 (1964). While there appear to be no pre-1937 Maryland cases expressly endorsing the *lex locus* rule, neither have we discovered any that disapproved or rejected it. Moreover, the essential premise of the decisions barring suit on dissimilar foreign statutes, see

note 14 *supra*, was that the law of the place of injury governed, and in each instance it was that law that the Maryland Court of Appeals refused to enforce. See London Guarantee & Acc. Co. v. Balgowan S.S. Co., *supra*. note 14.

16. Wilson v. Dailey, 191 Md. 472, 476, 62 A.2d 284, 285 (1948). See Kaufmann v. Service Trucking Co., *supra*, note 14, 139 F.Supp. at 5:

Sec. 2 clearly indicates that the Maryland legislature intends that the Maryland courts shall apply the substantive law of the jurisdiction where the cause of action arose. This is in accord with the general rule "that all matters pertaining to the substantive right of recovery under a wrongful death statute, including the right to recover, the nature of the right, and the party in whom it is vested, are governed by the law of the state where the injury resulting in death occurred." [Citations omitted:]

See also King v. Cooper Motor Lines, Inc., 142 F.Supp. 405, 406 (D.Md.1956).

Appeals, shortly after *Kilberg*, abandoned its position in that case that the measure of damages was governed by New York, and not Massachusetts, law because damage limitations are procedural in nature, and not substantive.[17] The broad language of the Maryland statute, enjoining the courts to give effect to "the rights and obligations created by and existing under the laws of the foreign jursidiction," suggests strongly that Maryland would enforce a foreign limitation on the damages recoverable for wrongful death. Though Section 2 is in terms applicable only to suits based on the laws of another state, the District of Columbia, or a territory of the United States, there is no reason for us to suppose that the Maryland courts would refuse to follow the approach it represents when the cause of action arises under the law of a foreign country.[18] And if a Maryland court would not disregard Brazilian law for the benefit of one of its own residents in a suit brought there, why should a court sitting in the District of Columbia do so at the expense of substantial and legitimate interests of Brazil?

Two recent cases support the decision we reach here. Truath v. Northeast Airlines, Inc., Civil No. 149–256, S.D.N.Y., grew out of the same accident as *Kilberg*, and it was initially consolidated for trial with Pearson v. Northeast Airlines, Inc., 199 F.Supp. 539 (S.D.N.Y.1961), aff'd, 309 F.2d 553, 92 A.L.R.2d 1162 (2d Cir. 1962) (en banc), cert. denied, 372 U.S. 912, 83 S.Ct. 726, 9 L.Ed.2d 720 (1963). Both the deceased passenger and his surviving dependents were residents of New Jersey. After the trial judge ruled in *Pearson* that he was bound to follow the New York rule enunciated in *Kilberg*, the plaintiff in *Truath* moved to amend her complaint to allege damages in excess of the Massachusetts limitation. Her motion was denied on the ground that there was no indication that New Jersey would have followed any law except that of the place of the injury. Although this ruling was never appealed because Mrs. Truath's claim was settled prior to trial, it seems to us to represent a correct understanding of the policies that were thought to control in *Kilberg*. New York, whose conflict of laws rule the District Court was obliged to follow,[19] had no interest in enforcing its protective policy where both the deceased and his dependents were non-residents, especially when the state of their residence would not have asserted its own interest if the suit had been brought there. The proper law to apply was that of Massachusetts, "the only state having an interest in the matter." [20]

In Gore v. Northeast Airlines, Inc., 222 F.Supp. 50 (S.D.N.Y.1963), which also arose out of the Nantucket crash, the same District Judge who had presided in *Pearson* and *Truath* denied the plaintiff's motion to strike Northeast's affirmative defense based on the Massachusetts damage limitation. The plaintiff, suing as executor of the deceased who had himself been a New York domiciliary, was a citizen of Maryland and a resident of the District of Columbia. The deceased, like Kilberg and Pearson had purchased his ticket in New York. But his beneficiaries all lived outside New York. His widow and two minor children had taken up residence in Maryland a month after his death. Two adult children, from a prior marriage, at all times

---

17. See Davenport v. Webb, 11 N.Y.2d 392, 230 N.Y.S.2d 17, 183 N.E.2d 902 (1962). See also LEFLAR, CONFLICT OF LAWS, § 65, at 118, § 114, at 220 (1959); Currie, *Conflict, Crisis and Confusion in New York*, 1963 DUKE L.J. 1, 5.

18. There is no evidence, for example, that Section 2 was intended to implement an obligation, real or imagined, imposed upon the State of Maryland by the Full Faith and Credit Clause of the Constitution. See Hughes v. Fetter, 341 U.S. 609, 71 S.Ct. 980, 95 L.Ed. 1212 (1951).

19. See Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L. Ed. 1477 (1941).

20. See Currie, *Conflict, Crisis and Confusion in New York*, 1963 DUKE L.J. 1, 31–32, discussing Truath v. Northeast Airlines, Inc., Civil No. 149–256, S.D.N.Y.

relevant resided in California. The District Judge concluded, correctly we think, that New York's protective policy which had been held to govern in *Kilberg* was directed at "the deceased's surviving dependents who are domiciled in New York." He noted that in both *Kilberg* and *Pearson* not only the accident victims but also their sole beneficiaries were New York domiciliaries, both at the time of the accident and at the time of the suit. He further concluded that either California or Maryland would have applied the Massachusetts limitation if the suit had been brought there. In short, in both *Truath* and *Gore* the court found that New York had no interest of its own substantial enough to justify rejection of the Massachusetts limitation when the deceased's beneficiaries resided elsewhere, and that a New York court would not ignore that limitation if the state of their residence would not do so.

Our decision is consistent as well with the most recent formulation of the *Restatement (Second), Conflict of Laws*.[21] Section 379 sets forth the general rule in tort cases as follows:

(1) The local law of the state which has the most significant relationship with the occurrence and with the parties determines their rights and liabilities in tort.

(2) Important contacts that the forum will consider in determining the state of most significant relationship include:

(a) the place where the injury occurred,

(b) the place where the conduct occurred,

(c) the domicile, nationality, place of incorporation, and place of business of the parties, and

(d) the place where the relationship, if any, between the parties is centered.

(3) In determining the relative importance of the contacts, the forum will consider the issues, the character of the tort, and the relevant purposes of the tort rules of the interested states.

This enumeration of significant relationships does not include that of forum *qua* forum.[22] The injury in the case before us occurred in Brazil, as did appellee's negligent conduct, if it was negligent at all. Vincent Tramontana was an American national, domiciled in Maryland, and so are his widow and children. Varig is a Brazilian corporation, which does business throughout the world. The "relationship" between the parties, if it can be called that, existed fleetingly—and in Brazil. By these criteria, the only state, other than Brazil, with a substantial claim to the application of its law is Maryland, which apparently would apply the Brazilian law in a case brought there. Thus it is that the only relation-

---

21. RESTATEMENT (SECOND), CONFLICT OF LAWS (Tent. Draft No. 9, 1964).

22. Compare Currie, *The Constitution and the Choice of Law: Governmental Interest and the Judicial Function*, 26 U. CHI.L.REV. 9–10 (1958). Even for those who prefer to start with the fact of the forum and to place the burden of proof on those who would displace its law, such burden can be sustained by a showing of the lack of significant relationships between the forum, on the one hand, and the parties or the event, on the other. See EHRENZWEIG, CONFLICT OF LAWS § 213, at 555 (1962):

(1) Here, as elsewhere, the law of the forum is the starting point. * * *

This law will be displaced only if there is a compelling reason for doing so.

(2) Such a reason exists where in an automobile or private airplane accident the wrongful death occurred in an operation participated in by both parties both of whom were domiciliaries of the same state. In that case the law of that state will be applied as that whose impact both parties could have reasonably foreseen. * * *

(3) In all other cases the lex fori remains applicable unless either the plaintiff or *the defendant has been forced into a forum devoid of any such contact as would justify application of its own law.* [Emphasis added.]

ship of the District of Columbia to this claim is that it provides a forum with jurisdiction over the appellee. That is hardly a reason for the forum to prefer its own notions of policy to those embodied in the Brazilian law which created the claim appellant is asserting.[23]

## III

A separate facet of appellant's public policy argument is that the Brazilian limitation on recovery for wrongful death should be disregarded entirely because of the recent marked decline in the dollar value of the Brazilian cruzeiro. Brazil's current economic problems are a matter of common knowledge, including the fact that inflation has depreciated the Brazilian currency by more than 600 per cent since the accident occurred in 1960. This development undoubtedly contributes to the appeal of appellant's argument, but it does not, in our view, warrant a result different from that we would reach had the value of the cruzeiro in terms of the dollar remained unchanged.

Brazil's interest in the protection of the financial integrity of its most important means of domestic transportation almost certainly has not been diminished by the decline in the value of its currency. Indeed, its concern may well have increased in proportion to the rate of domestic inflation. A reluctance to reflect that decline in those prices that are subject to direct government control would be wholly understandable. See text at page 472 supra. Moreover, an unpredictable and virtually immeasurable factor would be imported into the decision of international conflict of laws

cases if the otherwise applicable law were subject to being displaced because of the recent history of the relative values of the currencies involved. Courts would be called upon in each case to determine at what point a declining rate of exchange of a foreign currency made application of the foreign law intolerable. Should Brazilian law be disregarded if the cruzeiro had depreciated only 300 per cent? Or 50 per cent? Victims of the same negligence might recover widely differing amounts, depending, not on where they lived—a not irrelevant factor, as we have suggested—but on *when* they sued.

Considerations of comity among sovereign nations certainly have relevance in this context. International balance of payments problems have a way of assailing the weak and the strong alike, and it is not only the underdeveloped nations who feel the sometimes rapidly fluctuating effects upon their exchange rates of both domestic and international economic factors, over some of which at least they have little or no control. If the courts of one country make the applicability of the law of another turn on the way the exchange balance happens to be inclined at the moment, a speculative and highly artificial element would be intruded into those considerations normally recognized by civilized nations as germane in the choice of applicable law. And the forum so motivated, whether it knows it or not, wields a two-edged sword.

One further question remains, though it is one not raised by the parties.[24] The District Court converted the

---

23. Tentative Draft No. 9 of the *Restatement (Second)* also includes a provision, Section 391, which is expressly applicable to suits for wrongful death:

In an action for wrongful death, the local law of the state where the injury occurred determines the rights and liabilities of the parties, unless some other state has a more significant relationship with the occurrence and the parties as to the particular issue involved, in which event the local law of the latter state will govern.

A note to this section makes clear that in wrongful death actions also the state of "most significant relationship" is to be ascertained "by the same principles as control selection of the law governing personal injuries in general."

24. Appellant's argument has been that, because the judgment in dollars reflects a striking weakness of the cruzeiro *vis-a-vis* the dollar as of the day of its entry, the forum should disregard the Brazilian limitation entirely and apply its

100,000 cruzeiro ceiling on recovery into dollars at the rate of exchange prevailing on October 14, 1963, the date of the entry of its judgment. Although New York, alone among jurisdictions in this country, and England appear to follow a rule that recovery in tort is to be measured in terms of the rate of exchange on the date of the wrong, we think the District Court applied the sounder rule. This "day of judgment" rule has the support of the authors of the *Restatement (Second), Conflict of Laws* § 612a, (Tent. Draft No. 11, 1965), and is in accord with the Supreme Court's most recent decision on the point, Die Deutsche Bank Filiale Nurnberg v. Humphrey, 272 U.S. 517, 47 S.Ct. 166, 71 L.Ed. 383 (1926). It has been endorsed by the majority of writers who have considered the problem.[25] And it has been applied by both the Second Circuit and the United States District Court in Maryland in tort cases. Shaw, Savill, Albion & Co. v. The Fredericksburg, 189 F.2d 952 (2d Cir. 1951); The Integritas, 3 F.Supp. 891 (D.Md. 1933). The rule provides the plaintiff with the dollar equivalent of the amount

he would recover if he had sued in the country whose law determines his right to recover, and it thereby ensures that he neither suffers nor benefits from the fact that he chose another forum in which to litigate his claim.

The judgment appealed from is

Affirmed.

FAHY, Circuit Judge (concurring).

I concur in the opinion of Judge McGowan for the court that the forum law regarding damages for wrongful death occurring in the District of Columbia does not govern this case, and that the Brazilian limitation of recoverable damages applies. However, were it not for the fact that plaintiff seems to concede that should the District of Columbia limitation not apply the limitation found in the Brazil Air Code governs the amount of recovery, I would leave the amount of recovery open for determination upon the basis of more ample information as to what the Brazilian law, as applied by the courts of Brazil, would permit to be recovered in this case.

own law. It has not asked, even alternatively, that the conversion rate used in the judgment be that either of the date of the accident or of the initial enactment of the Brazilian Air Code.

25. See, *e.g.*, MANN, THE LEGAL ASPECT OF MONEY 315 (1953); NUSSBAUM, MONEY IN THE LAW 372 (1950); Evan, *Rationale of Valuation of Foreign Money Obligations*, 54 MICH.L.REV. 307 (1956); Fraenkel, *Foreign Moneys*

*in Domestic Courts*, 35 COLUM.L.REV. 360 (1935); Note, 40 HARV.L.REV. 619 (1927). Compare Gluck, *The Rate of Exchange in the Law of Damages*, 22 COLUM.L.REV. 217 (1922); Note, 65 COLUM.L.REV. 490 (1965). *Cf.* Aratani v. Kennedy, 115 U.S.App.D.C. 97, 317 F. 2d 161, 323 F.2d 427 (1963), cert. granted, 375 U.S. 877, 84 S.Ct. 147, 11 L.Ed.2d 110, motion for reference granted, 376 U.S. 936, 84 S.Ct. 790, 11 L.Ed.2d 657 (1964).