[Civ. No. 37672. Second Dist., Div. Five. Apr. 4, 1972.]

EDWARD W. KASEL, Plaintiff and Appellant, v.
REMINGTON ARMS COMPANY, INC., Defendant and Respondent.

## COUNSEL

Max Fink, James R. Bramble and R. Stephen Duke for Plaintiff and Appellant.

Morgan, Wenzel & McNicholas and William Marshall Morgan for Defendant and Respondent.

## OPINION

**REPPY, J.**—This is an appeal from a judgment on a jury verdict for defendant and respondent, Remington Arms Company, Inc., a Delaware corporation, having its home office in Connecticut (hereinafter, Remington), and against plaintiff and appellant Edward W. Kasel (hereinafter, plaintiff), in an action for personal injuries and damages arising out of the explosion of a 12-gauge shotgun shell.

## I. STATEMENT OF FACTS

### A. Plaintiff's Injury and Source of Defective Shell

In late January 1965 plaintiff left Los Angeles, California, for Navojoa, Mexico, on a hunting trip along with two companions. He carried with him his 12-gauge Remington shotgun and four boxes of Remington Express ammunition, that being the amount of ammunition which Mexico allowed hunters to bring into the country.

Plaintiff's party, while still in California, had arranged for the purchase of more shotgun ammunition from a Mr. McElroy in Sonora, Mexico. The purchase was completed there. The shells were Remington Express.[1] On conflicting evidence, but weighted that way, an implied finding, which we cannot disturb, was made that these shells were manufactured in Mexico.

On January 30, 1965, plaintiff's party went hunting, and plaintiff was using the shells purchased in Mexico.[2] Toward the end of the day, plaintiff suggested that it was time to go back, but his friends urged that they continue shooting for 10 more minutes. As plaintiff shot in this closing period of the hunt, his gun exploded. His right hand was badly injured by the blast.

An expert witness testified that in his opinion the explosion of the gun had been the result of excessive pressure which had resulted from an excessive charge of powder in the shotgun shell fired by planitiff. Evidence to the contrary was so insignificant that it must be accepted that the shell was defective. There is no basis for an argument that the jury's general verdict was based on an implied finding that the shell was not defective.

### B. Remington's Relationship to the Defective Shell

The defective shell which caused the injury to plaintiff had been manufactured in Mexico by a company called Cartuchos Deportivos De Mexico, S.A. (hereinafter, CDM). The evidence in the record indicates that Remington had caused CDM to be created, and that CDM was affiliated with Remington through Remington's ownership of 40 percent of the outstanding common stock of CDM and the existence of interlocking or common (see 13 Cal.Jur.2d, Corporations, § 318, p. 87, for interchangeable use of terms) directors and officers. Particulars from the record pertinent to the problems under review follow:

---

[1] It appears that Barth, acting for the party, made inquiry as to who was the Remington dealer in Sonora, Mexico. McElroy was a Remington dealer.

[2] Under all of the circumstances disclosed in the record, it is most likely that so much of these shells as were taken by plaintiff would be used by him first in Mexico on the specific hunting trip and then any left over in California where he resided.

In 1961 the operators of Remington became interested in creating an affiliate to produce, under license, Remington ammunition in Mexico. They projected motivating and assisting local business interests in forming a Mexican corporation to build and run a factory there. They also contemplated that Howard B. Harmon, Jr., (Harmon), an employee of Remington in Connecticut, would be the director of operations for the Mexican plant and a member of CDM's board of directors.

CDM was organized in November 1961. In furtherance of its plans Remington entered into three agreements with CDM relating to the manufacture and marketing of ammunition under Remington's trademarks: Trademark License Agreement, Contract for Sale of Technical Information, and Technical Services Contract.

Pursuant to the Trademark License Agreement, Remington granted CDM a 20-year nonexclusive, nontransferable license to use Remington's registered trademarks on ammunition manufactured by CDM. Under the agreement Remington had the right to approve the use of its trademarks on the ammunition, the ammuntion packages, and any advertising. Remington also had the right to inspect and control the quality of all ammunition on which its trademarks were used.[3] In exchange, CDM agreed to pay Remington a royalty of 0.5 percent on all net sales of CDM within Mexico.

The Contract for the Sale of Technical Information provided for the sale of Remington's scientific processes relating to the manufacture of ammunition for the sum of $100,000. A condition required CDM to insert on all shell packages, in addition to Remington's trademarks, the words, "Manufactured in Mexico under contract with Remington Arms Company, Inc." (CDM made the insertion in Spanish.)

Under the Technical Services Contract Remington obligated itself to train CDM personnel in Connecticut and to provide personnel to CDM, including a director of operations, a production advisor, and a sales advisor. Remington also agreed to provide assistance and consultation on production techniques and marketing and on procurement of machines, equipment and raw materials to perform testing in Remington's laboratories, and to advise on ballistics. In exchange, Remington was to receive a

---

[3] This may well have been pointed, in part, toward assurance that none of the manufactured products would be defective and injure someone, a result which would tarnish the Remington reputation even if it posed to Remington little likelihood of liability on its part.

Incidentally, although the Trademark License Agreement gave Remington this right to exercise controls over the quality of ammunition manufactured by CDM, Remington apparently did not exercise the right except to test one batch of shells in May 1965 and another batch six months later.

fee of 1.5 percent on all net sales of CDM for the term of the contract (20 years).

Before and after execution of the aforementioned agreements Remington substantially financed the facilities at CDM. In June 1961 Remington commenced this sponsoring program by purchasing $160,400 in CDM common stock. It increased its stock ownership in CDM by additional purchases amounting to $113,067 in August 1961, $269,280 in February 1962, $273,899 in August 1962, $48,960 in October 1966 and $16,972 in December 1966. Remington, at time of trial, held 120,000 shares of CDM out of 300,000 shares outstanding. Because of this 40 percent stock ownership it characterized CDM as its affiliate. Besides having acquired this stock, Remington also purchased $408,327 of CDM bonds issued in January 1963, of which $125,701 was repaid and the balance converted into new bonds in February 1967.

Three Mexican nationals had been sent to Remington's Connecticut plant for training in 1961. They returned to CDM sometime in 1962. Mexican nationals constituted the general work force of the plant.

As of January 30, 1965, the date of plaintiff's accident, a Mexican national was the chief executive officer of CDM. Management of CDM was in the hands of its board of directors. It consisted of 10 regular members and 9 alternates. Four of the regular members were Remington officials from the United States. One of the alternate directors was such a Remington official, and another alternate director, a Mexican national, was a member of the law firm which represented Remington in Mexico. CDM had four officers including two who were also officers of Remington. The two additional officers were Mexican nationals.

Harmon, as director of operations, was on CDM's payroll from 1961 until June 1965, when he left Mexico. However, he kept his home in Connecticut; he enjoyed the continued protection of his Remington retirement fund and group insurance; and he received a bonus from Remington while he was in Mexico. While he worked for CDM, Harmon reported directly to the vice-president of Remington.

Much of the heavy working equipment installed in the Mexican plant was procured and delivered by Remington. All the specifications for the machinery used at the CDM plant were developed at Remington's Connecticut plant.

While the CDM plant was getting established, 18 Remington employees were sent down to Mexico pursuant to the Technical Services Contract to assist CDM in the establishment of manufacturing and sales operations.

They stayed for periods varying from a few days in some cases to a month in others, to four and one-half years in the case of Harmon.

CDM started producing shells in June 1963.

### C. Circumstances Influencive of Purchase or Use of Remington Products in Mexico

Plaintiff introduced in evidence several boxes of the shells purchased there. The boxes are red and green and contain the words "Remington" and "Remington Express" on the front and side panels in white script. The side panels also contain a picture of a shotgun shell in green and gold bearing the words, "Extra Long Range," again, in white. All the rest of the printing on the box is in Spanish. Plaintiff also introduced one of the shells from the boxes purchased in Mexico. The shell is green. There is stamped on its brass base the combination of words, "Remington Express 12 Ga." Plaintiff stresses certain similarities and Remington certain differences in composition and design of the Mexican and the American product. We do not feel that either circumstance is of great consequence to a proper disposition of this case. However, later we do note wherein the similarities might have had some significance to the trial court.

Remington engaged in an extensive advertising campaign.[4] An ample proportion was centered in California. Much of it was carried on in magazines.[5] In addition, Remington's annual catalogue was distributed through dealers throughout the United States with 11,000 to 12,000 in California. Also, there were circulars distributed (15,000 in 1966 for example) and pictorial signs displayed by California dealers. The subject matter of all of this advertising included Remington "Express" shotgun ammunition. Expenditures were several hundred thousand dollars annually. That Remington's coverage was international in scope is reflected by the countries wherein registration of its trademark existed or was applied for.[6] Remington prod-

---

[4] This aspect of the proof was brought out in interrogatories and answers which were received in evidence as exhibits.

[5] Magazines listed were: American Rifleman, Farm Journal, Guns and Ammo, Mechanix Illustrated, Popular Mechanics, Argosy, Camping Trade Journal, Field and Stream, Guns & Hunting, Gun World, Outdoor Life, Popular Science, Sports Afield, and True.

[6] Argentina, Australia, Austria, Belgian Congo, Belgium, Bolivia, Brazil, Canada, Chile, China, Colombia, Costa Rica, Cuba, Curacao, Denmark, Dominican Republic, Ecuador, Egypt, France, Germany, Great Britain, Greece, Guatemala, Haiti, Honduras, India, Indonesia, Iran, Israel, Italy, Jamaica, Japan, Korea, Kuwait, Liberia, Malaya, Netherlands, New Zealand, Nicaragua, Norway, Pakistan, Panama, Paraguay, Peru, Philippine Republic, Portugal, Puerto Rico, Salvador, Singapore, South Africa, South Viet Nam, Spain, Sweden, Switzerland, Thailand, Turkey, Uruguay, and Venezuela.

ucts were sold in all these countries with two exceptions. It is inferable that this international aspect of Remington would become known through its catalogues, circulars and advertisements.

Remington did a large business in California. Plaintiff acquired and was using a Remington shotgun and was a consumer of other Remington products.

## II. PROCEEDINGS AT THE TRIAL

Remington made a general appearance in the case and raised no objection to the "forum" jurisdiction of the court. Pursuant to stipulation of counsel, the trial was divided into two phases. The first session was for the purpose of having the trial court determine, without a jury, whether Mexican or California law was applicable. In effect, it was stipulated that Mexican law did not recognize the theory of products liability.[7] Evidence[8] was received showing that Mexican law did not compensate for pain and suffering in personal injury cases, and counsel for plaintiff stated that he had no basis for such recovery in Mexico. The trial court decided that the law of California would be applied. Counsel for plaintiff then made the commitment that he was going to proceed on products liability (ruling out negligence), and the attorney for Remington advised the trial court that this was satisfactory with him.

After the submission of evidence, plaintiff offered numerous special jury instructions which were all refused by the trial court. In part they related to plaintiff's different theories of California law for imposing strict liability in tort upon Remington as "an integral part of the overall producing and marketing enterprise of the defective product."

The trial court, on its own motion, instructed the jury that the law as to strict liability in tort would apply to the case only if the jury found: (1) that the shell in question was actually manufactured by Remington in the United

---

[7]A brief on Mexican law issued by a Mexico City law firm and submitted by Remington's attorney was in the file and before the trial court. Counsel for plaintiff stipulated that it correctly stated the law. He further stated that it was his understanding that the plaintiff had no right of recovery in Mexico on what is called products liability in California. The trial court agreed with that appraisal. Counsel for Remington stipulated "that that is the way [the brief] reads." The brief was received in evidence. In part I it sets out that the Civil Code of the State of Sonora provides for recovery in "physical" and "moral" areas occasioned by "acts in violation of the law or the accepted standards of care"; and that "there is no implication that such wrongful acts are derived from a contract entered into between the person causing damages and the injured person." In different articles of the Sonora Civil Code provision is made for recovery of "property loss or losses of expected profits" for contract violations. The inference from this brief is that Sonora had no products liability concept.

[8]The same brief referred to in footnote 7.

States; or (2) that, although the shell was manufactured in Mexico, CDM was Remington's agent in the manufacture of it.

The jury returned a verdict for Remington. Judgment on the verdict was entered.

Plaintiff moved for a new trial asserting that it was error for the trial court to have refused to give the jury any of plaintiff's requested special instructions and that it was further error for the trial court to have instructed the jury that Remington's liability was conditional on a premise that it was the actual manufacturer of the defective shell, or on a premise that CDM, as actual manufacturer, was acting as agent for Remington.

Plaintiff appeals from the judgment on the verdict in favor of Remington,[9] making it clear that his dissatisfaction is only with the outcome of the second phase. Remington has not filed an appeal as to either phase of the trial. On appeal plaintiff urges that the trial court committed prejudicial error in the respects it had argued at the motion for new trial.

### III. DISCUSSION

### A. Products Liability Issue

After giving instructions to aid the jury in finding, as a question of fact,[10] whether or not there was agency, the trial court gave the following instruction:

"The instruction I am about to give you will apply to this case only if you find one of the two following statements to be true:

"1. That the shell in question was manufactured by the defendant Remington in the United States;

"OR

"2. That the shell in question was manufactured in Mexico [CDM] and further [CDM] was the agent of . . . Remington in the manufacturing of the shell."

---

[9]Appellant actually appealed from "the verdict in favor of Remington Arms Company, Inc., entered on July 9, 1970, in Judgment Book 6556, Page 27." We construe this to be an appeal from the judgment as so entered. A copy of the judgment is a part of the record on appeal. (See *Robins* v. *Weis*, 97 Cal.App.2d 144, 145 [217 P.2d 156].)

[10]Plaintiff himself offered several instructions on the law of agency which were refused by the trial court. We have considered this circumstance and concluded that plaintiff's action did not constitute invited error. Plaintiff's instructions were offered because the trial court indicated its intention to limit the jury's consideration of strict liability by a finding of either actual manufacture or agency.

The court then gave BAJI[11] instruction No. 9.00 (Products Liability—Strict Liability in Tort).

Having in mind three possible bases for finding Remington strictly liable in tort (i.e., 1. that Remington was the actual manufacturer of the defective shell; 2. that CDM was the actual manufacturer but acted as Remington's agent; and 3. that Remington was an integral part of the enterprise that placed the defective shell in the stream of commerce), the trial court, in effect, found as a matter of law that Remington was not an integral part of the enterprise and thus submitted the questions of actual manufacture and agency to the jury.[12]

■■■ It is our opinion that the trial court erred in limiting the application of strict liability in tort to a factual finding of either actual manufacture by Remington or an agency relationship between CDM and Remington. The evidence of Remington's involvement in the "enterprise" was uncontradicted and was sufficient so that the trial court should have found as a matter of law[13] that Remington was an integral part of the composite business enterprise which placed the defective shell in the stream of commerce, and should have instructed the jurors that it would be strictly liable if they found: (1) that the shell had been placed on the market under circumstances wherein it was known that it would be used without inspection for defects, (2) that the injury was caused by a defect which, unbeknown to plaintiff, made it unreasonably dangerous for its intended use, and (3) that it was being used for the purpose for which it was designed.[14]

---

[11]California Jury Instructions Civil (5th rev. ed.) No. 9.00, page 275.

[12]In effect, it was the holding of the trial court that only as the manufacturer or as the principal of an agent manufacturer could Remington be considered part of the enterprise that placed the defective shotgun shell in the stream of commerce. Clearly, at this point the trial court was accepting the stream of commerce involved as originating in Mexico and, undoubtedly, as mostly continuing in Mexico.

[13]We have not found any decision wherein the issue of a party's joinder with the responsible enterprise was put to a jury under instructions from the court. In many examined, the facts pertinent to that issue were not more settled nor convincing than those in the instant case.

[14]Paraphrased from BAJI No. 9.00, the comment to which cites among other authorities: *Greenman* v. *Yuba Power Products, Inc.,* 59 Cal.2d 57 [27 Cal.Rptr. 697, 377 P.2d 897, 13 A.L.R.3d 1049]; *Vandermark* v. *Ford Motor Co.,* 61 Cal.2d 256 [37 Cal.Rptr. 896, 391 P.2d 168]; Witkin, Summary of California Law (7th ed.) Torts, sections 388-A—388-O (Supp. 1967); Prosser on Torts (3d ed.) pages 672-684; Prosser, *Strict Liability to the Consumer in California,* (1966) 18 Hastings L.J. 9; *McCurter* v. *Norton Co.,* 263 Cal.App.2d 402 [69 Cal.Rptr. 493]; Restatement Second Torts, section 402-A (com. i); *Elmore* v. *American Motors Corp.,* 70 Cal.2d 578 [75 Cal.Rptr. 652, 451 P.2d 84]. The instruction also has a definition of "unreasonably dangerous," for optional use, and a direction on burden of proof. The provisional instructions on damages, as given, of course, would have followed.

The reviewing courts issuing the decisions cited in this opinion all dealt with the subject in such a way as to put the involved entity into the composite enterprise as a matter of law.

██ California courts, long in the forefront of the development of product liability law, have adopted a rule which places strict tort liability for defective products upon the overall producing and marketing enterprise responsible for placing such products in the stream of commerce.

The following entities besides the manufacturer, obviously the principal one, have been found to be integral components of the particular enterprise responsible for placing alleged defective products on the market: a lessor (*McClaflin* v. *Bayshore Equipment Rental Co.*, 274 Cal.App.2d 446 [79 Cal.Rptr. 337] [stepladder] and *Price* v. *Shell Oil Co.*, 2 Cal.3d 245 [85 Cal.Rptr. 178, 466 P.2d 722] [gasoline truck]); a developer (*Kriegler* v. *Eichler Homes, Inc.*, 269 Cal.App.2d 224 [74 Cal.Rptr. 749] [a builder engaged in mass tract development of homes[15]]); a licensee (*Garcia* v. *Halsett*, 3 Cal.App.3d 319 [82 Cal.Rptr. 420] [a launderette owner who was said to have licensed the use of a washing machine to plaintiff]); a retailer (*Vandermark* v. *Ford Motor Co.*, *supra*, 61 Cal.2d 256 [retailer of a defective automobile]); and a wholesale-retail distributor (*Barth* v. *B. F. Goodrich Tire Co.*, 265 Cal.App.2d 228 [71 Cal.Rptr. 306] [who merely distributed tires from his stock on order of the manufacturer]).

As the cases cited indicate, the courts have had no problem applying strict liability in tort downward through the various links in the marketing chain from manufacturer to distributor, to retailer, and so forth. It might be questioned whether enterprise involvement should extend up from the manufacturer. However, *Canifax* v. *Hercules Powder Co.*, 237 Cal.App.2d 44 [46 Cal.Rptr. 552] applied strict liability upward in the marketing chain to a large manufacturer of blasting material which caused the actual manufacturer thereof to place a defective dynamite fuse into the stream of commerce.[16]

---

[15]Cf. *Connor* v. *Great Western Sav. & Loan Assn.*, 69 Cal.2d 850, 864 [73 Cal. Rptr. 369, 447 P.2d 609], a negligence case, wherein a savings and loan association, in effect, was said to be part of the development enterprise. The policy enunciated in Civil Code section 3434 enacted subsequent to the *Connor* case, we feel, is to be limited to the negligence field; and we note that the financing entity is not insulated where it engages in acts "outside the scope of the activities of a lender . . . ."

[16]*Canifax* is an action arising from a dynamite explosion, the cause of which was traced to a defective fuse. Defendant Hercules was a large dynamite manufacturer who took an order for dynamite and fuses from a jobber who actually supplied them to the customer. The fuses, however, were manufactured by Coast Manufacturing and shipped by Coast directly to the jobber. The court still found Hercules liable as part of the enterprise, quoting comment f, Restatement Second of Torts, section 402A, and stating, "Thus, with the operations of Hercules described, it should undoubtedly be included within the rule. The fact that it chooses to delegate the manufacture of the fuse to another and that it causes the manufacturer to ship the product directly to the consumer cannot be an escape hatch to avoid liability." (P. 52.)

Plaintiff has cited no cases and we have found none which apply strict liability in tort upward to a franchisor, or a trademark licensor as in the instant case. Although the agreements between Remington and CDM were not labeled franchise agreements, the analogy is pertinent because the licensing of trademarks and the sale of technical know-how are the backbone of most franchising operations. (*Liability of a Franchisor for Acts of the Franchisee,* 41 So.Cal.L.Rev. 143, 144.) However, as long as the franchisor or trademark licensor can be said to be a link in the marketing enterprise which placed a defective product within the stream of commerce, there is no reason in logic for refusing to apply strict liability in tort to such an entity.[17]

The above listed cases have stressed that under the stream-of-commerce approach to strict liability no precise legal relationship to the member of the enterprise causing the defect to be manufactured or to the member most closely connected with the customer is required before the courts will impose strict liability. It is the defendant's participatory connection, for his personal profit or other benefit, with the injury-producing product and with the enterprise that created consumer demand for and reliance upon the product (and not the defendant's legal relationship (such as agency) with the manufacturer or other entities involved in the manufacturing-marketing system) which calls for imposition of strict liability. (*Garcia* v. *Halsett, supra,* 3 Cal.App.3d 319, wherein the court stated (at p. 325): "The precise legal relationship between the parties has not played a particularly significant role in the cases imposing strict liability.")

Also California has utilized the enterprise-stream of commerce liability concept in the strict liability field without regard for the individual defendant's control over the cause of defect in the product, although such control, if it exists, would remain a significant factor. In *Vandermark* v. *Ford Motor*

---

[17]In an article entitled, *Tort Liability of Trademark Licensors,* 55 Iowa Law Review 693, the author argues for an extension of products liability to include trademark licensors, concluding, "The products liability rationale should be extended to the licensors of trademarks. It is inconsistent to hold producers, manufacturers, and others in the line of supply to a standard of care with respect to the public, and at the same time permit the trademark owner to escape this responsibility by entering a license agreement. If the mark owner were to utilize the mark on his own product, the traditional theories of products liability would provide the injured consumer with a remedy. The facts that the trademark is an important factor in consumer product selection and that the mark owner has a great influence on the quality of the final product are not changed by the licensing agreement. All that is changed is the mark owner's duty to the public with respect to those products." And in an article entitled *A Franchisor's Liability for the Torts of his Franchisee,* 5 University of San Francisco Law Review 118, at page 134, the author, John F. Stuart, opines, "Products liability fits naturally into the franchise system. Franchising's very purpose is to put products into the 'stream of commerce'. Thus, depending upon the franchisor's relation to the product, strict liability can be a significant vehicle of recovery."

*Co., supra,* 61 Cal.2d 256, Maywood Bell Ford, the retailer of a defective automobile, argued that strict liability in tort applied only to actions against manufacturers. The court stated: "Retailers like manufacturers are engaged in the business of distributing goods to the public. They are an integral part of the overall producing and marketing enterprise that should bear the cost of injuries resulting from defective products." (P. 262.) In *Barth* v. *B. F. Goodrich Tire Co., supra,* 265 Cal.App.2d 228, Perry & Whitelaw, a wholesale and retail distributor for Goodrich tires was held strictly liable in tort although it neither manufactured nor sold the defective tire in question, emphasizing that the distributor benefited from servicing Goodrich's (the manufacturer's) national accounts.[18]

We recognize that this court in *Hanberry* v. *Hearst Corp.,* 276 Cal.App. 2d 680, 687-688 [81 Cal.Rptr. 519, 39 A.L.R.3d 173], refused to apply strict liability in tort to a product endorser; however the rationale of that decision was (1) that Hearst, as publisher of Good Housekeeping magazine, was not directly involved in manufacturing products for or supplying products to the consuming public and was not a part of the manufacturing and supplying enterprise that produced the defective shoe, and (2) that Hearst, as such lacked any control over the manufacturing process. The rationale of *Hanberry* is not applicable to Remington in the instant case. (The rationale of *Hanberry* may warrant reevaluation in the light of the articles heretofore cited. Where it can be established that defendant by its avowed testing was the responsible inducement for the purchase by plaintiff, we see

---

[18]In *Barth, supra,* the plaintiff had been given a car by his employer, American, for business and personal use. His employer had an arrangement with B. F. Goodrich to furnish replacement tires, and in 1961 plaintiff wrote his employer's home office notifying them he needed two new tires for the vehicle. He received a reply indicating that the tires had been ordered from a mid-western B. F. Goodrich distributor, Biltmore. The plaintiff then received a draw order from Biltmore informing him that the tires could be picked up at Perry & Whitelaw in San Francisco. Thereafter, Perry & Whitelaw installed the tires from its stock. Perry & Whitelaw's invoice indicated that the tires were sold to Goodrich and were to be delivered to American and charged to Biltmore. Perry & Whitelaw sent this invoice to Goodrich, who in turn, billed Biltmore, and allowed Perry & Whitelaw a service charge for handling the transaction as well as a credit for the tires removed from its stock. The trial court instructed the jurors that they had to find that Perry & Whitelaw had made an actual sale of the tires to American before they could be held liable. The Court of Appeal disagreed. "Perry & Whitelaw argues it merely installed the tires in question for the minor fee of $4.13 and realized no profit on the transaction. The uncontroverted evidence, however, indicates that its role was not that minor. As an authorized Goodrich distributor Perry & Whitelaw benefited from servicing Goodrich's national accounts, like American, in addition to its other retail and wholesale business. The tire in question was removed from Perry & Whitelaw's stock of tires, and besides the installation fee, Perry and Whitelaw received a credit from Goodrich for the cost to it of the tire. In addition, Perry & Whitelaw stamped its name on the Goodrich form warranty. . . . [¶] *Clearly, Perry & Whitelaw was a part of the overall marketing enterprise for Goodrich tires.*" (P. 252, the court's italics.)

no reason to hold that defendant was not a necessary instrument in the stream of commerce.)

At the times of plaintiff's injury, Remington relatively recently had been instrumental in the organization of CDM for its own aggrandizement. Remington, of course, was enjoying advantages from the operations of its protegé. Besides the royalties reserved in the agreements, Remington could anticipate further exposure of its products not only in Mexico but also in the United States particularly with respect to California consumers who have ready access to hunting in Mexico. In motivating and participating in organizational procedures, in supplying CDM with the machinery and specifications for the manufacture of ammunition, in reserving the right to control the quality of ammunition manufactured by CDM upon which its trademark was to be placed,[19] in financing, setting up and supervising the plant in Mexico, in maintaining common members of the respective boards of directors, and in broadly advertising the products under its trademarks which would have fostered the CDM enterprise in some degree, Remington had more involvement in the enterprise which produced the defective shell than the typical retailer, distributor or wholesaler upon whom the courts have had no trouble imposing strict liability.

Remington seems to argue that California, because of international complications, should not use its otherwise entrenched enterprisal stream-of-commerce concept when the manufacturer component of the enterprise is a citizen of a foreign country (individual or corporate) or when the stream-of-commerce involved is almost entirely within the boundaries of the foreign country.

Although there is a temptation to believe, as Remington has argued, that the international aspect is to be dealt with in the field of strict liability as it exists in California and that the foreign stream-of-commerce and federal policy features might call for a new limitation on the applicability of the doctrine, careful analysis has convinced us that this problem more properly rests in the "choice of law" area and is to be resolved on conflict of laws principles. Once a California court, facing a conflicts issue wherein happenings in a foreign country and aspects of American foreign policy have been considered and have been found not influencive of the choice of another law, determines that its own law is the proper one to apply (see later discussion), there seems to be no good reason why it should rule that those same factors should constitute a special limitation on its enterprise stream-of-commerce policy in the products strict liability area. In any event, we

[19]The fact that the Remington trademark under which CDM operated may have been one that Remington obtained in Mexico does not weaken Remington's position in the so-called enterprise.

feel that the contingencies allegedly presaged by these factors are not sufficiently close in effect or deleterious as to warrant the promulgation of a special limitation on California's well set course in the products liability field. Moreover, where, as here, the effect of the advertising activity and the "local stream of commerce" tends to create a demand by Californians hunting in Mexico for the foreign produced article, the international policy concept fails of conviction.

Remington-stressed facts that the defective shell was manufactured, sold and used only in Mexico, and that Remington's promotional activities in Mexico productive of CDM operations were a part of United States foreign policy should be considered in balancing the contacts between Mexico and California as part of the determination regarding which jurisdiction has the more significant interest in the case, or possibly in determining if federal law should be used because of the dominance of the foreign policy feature, akin to the preemption theory.[20]

### B. Choice of Law Issue

As mentioned, the trial below was arranged in stages so that the trial court, sitting without a jury, might first determine whether Mexican or California law should apply to the case, plaintiff contending for California and Remington for Mexican law. The trial court determined that California law should apply.

Plaintiff asserts that because Remington failed to appeal, the adjudication with respect to choice of law is final. However, under the authority of Code of Civil Procedure section 906,[21] we may review the trial court's decision that California law should apply in order to determine whether plaintiff was or was not prejudiced by the trial court's questioned instruction. (*Mott* v. *Horstmann,* 36 Cal.2d 388, 393 [224 P.2d 11]; *Auer* v. *Frank,* 227 Cal.App.2d 396, 405 [38 Cal.Rptr. 684, 8 A.L.R.3d 1108]; *Central Manufacturing District, Inc.* v. *Board of Supervisors,* 176 Cal.App. 2d 850, 857 [1 Cal.Rptr. 733].) Plaintiff, of course, would not be prejudiced by the erroneous instruction requiring a finding of an agency rela-

---

[20]Remington never sought removal to the federal courts.

[21]Code of Civil Procedure section 906, derived from former Code of Civil Procedure section 956, provides in part: "The respondent, or party in whose favor the judgment was given, may, without appealing from such judgment, request the reviewing court to and it may review any of the foregoing matters [the verdict or decision and any intermediate ruling, proceeding, order or decision which involves the merits or necessarily affects the judgment or order appealed from or which substantially affects the rights of a party, including, on any appeal from the judgment, any order on motion for a new trial] for the purpose of determining whether or not the appellant was prejudiced by the error or errors upon which he [the appellant] relies for reversal or modification of the judgment from which the appeal is taken."

tionship between Remington and CDM before strict liability could be applied if we should determine that the court improperly applied California law. This is so because practically it was agreed by all concerned that Mexico does not recognize strict liability in tort, let alone the enterprisal stream-of-commerce rule, to which basis for liability plaintiff had limited his claim.

 Accordingly, we will consider Remington's alternate argument that the trial court erred in its decision that California law applied to the determination of issues raised in this case. The pertinent facts upon which the trial court made this ruling have already been set forth. We need only again advert to the fact that the trial court received the expert opinion of a Mexican attorney that Mexican law does not compensate for pain and suffering and that it was in effect stipulated that Mexican law gives no recovery under a products liability theory. We also remind that as we were bound by the fact finder's resolution of material conflicts in the liability phase of this case, we are obligated to view the circumstances in the light most favorable to the trial court's ruling in the choice of law phase of this case.

A number of modern theories have evolved for the determination of choice of law issues. They are well summarized and considered in a lead article in 60 California Law Review (Kühne, *Choice of Law in Products Liability,* 60 Cal.L.Rev. 1). Briefly, they are: (1) "The Jurisdiction-Selecting Method" involving single connecting factors such as place of manufacture, sale, injury and residence. (P. 12.) (2) "The Center-of-Gravity Approach" entailing the counting of contacts. (P. 13.) (3) "The Governmental-Interest Approach," involving the ascertainment of the interest that the competing jurisdictions might have in applying their own substantive laws. (P. 16.) For some, the interests of the parties are considered as involved in this theory. California embraces this concept, so we will discuss it more thoroughly hereafter. (4) "The Most-Significant Relationship Approach." (P. 20.) This is the rule adopted in Restatement Second of Conflicts of Law, section 145.[22] This theory is based on noting contacts which are to be evaluated according to their relative importance with respect to the par-

---

[22]The Restatement text is as follows: "(1) The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in section 6. ¶ (2) Contacts to be taken into account in applying the principles of section 6 to determine the law applicable to an issue include: (a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered. These contacts are to be evaluated according to their relative importance with respect to the particular issue."

ticular issue. (5) "Cavers' Principles-of-Preference Approach." (P.23.) This approach recognizes three types of clashes between varying competing jurisdictions and applies to them five principles of preference. This is the concept which makes distinctions between true and false conflicts.[23] (6) "Leflar's Better Law Approach." (P. 25.) The author points out that not unexpectedly the various forum courts using this theory have considered their own law to be the better law. (P. 26.) This system, he says, has been characterized as plaintiff-biased, an attribute which the doctrine "is bound, by its very purpose, to reflect . . . ." (P. 27.) (7) What must now be considered the latest theory, that pointed to by Leflar and espoused by the author in the California Law Review, is "the law most favorable to the plaintiff." (P. 30.) One of the supporting pillars of this concept is: "[T]he policy underlying the substantive law of products liability-consumer protection—has to be given full weight in the choice of law process. . . . Accordingly, an alternative reference rule calling for the application of the law most favorable to the plaintiff, chosen from the laws of the places of manufacture, of sale, and of injury, would be appropriate." (P. 38.) However, the author points out that his thesis "does not purport to supply a final solution to all choice of law problems involving products liability." (p. 32); and he concludes that his rule "coincides with the rationale that often underlies judicial decisions in this area, and once this basis is generally accepted, further refinements will follow as in the development of other new principles." (P. 38.) Therefore, we are not alarmed that, from the standpoint of his theory, one of the mentioned places is not selected to govern.

It is proper that we adhere to the conflicts policy set by our Supreme Court. At the same time it is not improper that we borrow pertinent non-conflicting concepts from other theories.

■ As indicated, California's approach to conflicts problems has been characterized as the "governmental interest" approach. That is, the courts of this state have given special attention to the actual interests of the concerned states in the resolution of the particular issue presented to the court. In terms of the Restatement formula, the emphasis in California is on the last sentence of the Restatement formula (see fn. 22) rather than on a mere mechanical balancing of the contacts. ■ In *Reich* v. *Purcell*, 67 Cal.2d 551, 553 [63 Cal.Rptr. 31, 432 P.2d 727], the California Supreme Court stated the proper approach to a conflicts problem in a multi-state tort as follows: "In a complex situation involving multi-state

[23]In the instant case it can be said that a clash between Mexican law and California law as governing principles for the disposition of plaintiff's claim is a false conflict because it is illogical to use Mexican law for the disposition of a suit between two United States litigants.

contacts, however, no single state alone can be deemed to create exclusively governing rights. [Citations.] The forum must search to find the proper law to apply *based upon the interests of the litigants and the involved states.*" (Italics added.) This concept, of course, is applicable to a state of our country versus a political entity of a foreign country. (*Tramontana* v. *S. A. Empresa De Viacao Aerea Rio Grandense,* 350 F.2d 468 [121 App.D.C. 338].)

It should be emphasized that California was the undisputed forum for this action. The forum has a definite interest in applying its own law. The law of the forum, "will be displaced only if there is a compelling reason for doing so." It is "applicable unless either the plaintiff or the defendant has been forced into a forum devoid of any such contact as would justify application of its own law." Ehrenzweig, Conflict of Laws (1962) section 213, page 555. Thus, in *Travelers Ins. Co.* v. *Workmen's Comp. App. Bd.,* 68 Cal.2d 7, 11-12 [64 Cal.Rptr. 440, 434 P.2d 992] (questioned in *LeVesque* v. *Workmen's Comp. App. Bd.,* 1 Cal.3d 627, 637 [83 Cal.Rptr. 208, 463 P.2d 432], on a point inapplicable here), the court stated, "California has rejected the traditional mechanical solutions to choice-of-law problems and adopted foreign law only when it is appropriate in light of the significant interests in the particular case. The significance of extra-state elements *varies directly with the nature of the forum's interest in a given case.*" (Italics added.) (See also: *Bernkrant* v. *Fowler,* 55 Cal.2d 588, 596 [12 Cal.Rptr. 266, 360 P.2d 906]; *Schneider* v. *Schimmels,* 256 Cal.App.2d 366, 373 [64 Cal.Rptr. 273]; *Ramirez* v. *Wilshire Ins. Co.,* 13 Cal.App.3d 622, 624 [91 Cal.Rptr. 895].)

Under the governmental interest approach relevant contacts are not disregarded, but are examined in connection with the analysis of the interests of the involved states in the issues, the character of the tort and the relevant purposes of the tort rules under consideration.

The basis for recovery in the instant case was limited by plaintiff, to Remington's satisfaction, to strict liability in tort. This sets the confines and important features of the inquiry. The significant contacts of the involved jurisdictions are as follows: California is the residence of plaintiff. It is one of the states in which Remington does business and in which Remington advertises the quality of its products.[24] Delaware is the state of

---

[24]It could have been expected, in fact was desired by Remington, that residents of California would purchase Remington ammunition in Mexico based on their familiarity with the United States product through use and through exposure to advertising, and that they would be attracted thereto at least in part by the similarity in appearance of the shells and their packaging between the American and Mexican product. The trial court was entitled to be impressed by those similarities in dealing with the choice of law issue.

the incorporation of Remington, and Connecticut is the state of Remington's principal place of business.[25] Mexico is the place of manufacture, ultimate purchase,[26] use of and injury by the defective shotgun shell. However, it is significant that no Mexican nationals are litigants in this action. The importance of these elements certainly diminishes when the only litigating parties are citizens of the United States despite the fact that each might have had expectations that events might occur in Mexico which would call for them making or defending claims.

Moreover, it must be remembered that at the time the choice of law ruling was made by the trial court at the end of the first procedural phase of the case, Remington was a "candidate" for actual or vicarious (through agency) manufacturer of the defective shell. The complaint charged that "defendants" (which included Remington) manufactured the defective shell. Plaintiff offered proof suggestive of the shell's manufacture in Connecticut and transmittal to CDM for inclusion in its stock of trade. All that was needed at the choice of law level was the arguable position that an enterprise situation existed which included Remington in order to make Remington a conceded products liability defendant. Of interest is this comment by the California Law Review author concerning *Southland Milling Co.* v. *Vege Fat, Inc.* (E.D.Ill. 1965) 248 F.Supp. 482: "The court felt unable to solve the choice of law problem for insufficiency of facts . . . . As a tentative choice of law solution . . . it simply stated that 'the factual allegations at the present state of this action indicate that the transaction is most closely associated with the State of Illinois as concerns the liability of defendant.'" (60 Cal.L.Rev. 1, 15, fn. 83.)

In the instant case, the trial court made its choice of law based on the evidence submitted in the first phase. As of then, it had not been irrevocably concluded that Remington was not the manufacturer. In the second phase, Remington, if it felt that stronger evidence had come in to show that it was not the manufacturer, might have moved, but did not move, for a reconsideration of the choice of law issue. We do not believe that such a move would have been availing, but we present the above rationale as alternative support for sustaining the trial court's decision on the conflicts issue.

As a matter of fact, with Remington being the chosen defendant, and CDM not being a litigant in the trial, it is reasonable to substitute for the

---

[25] Neither of the parties has urged that the law of Delaware or Connecticut is applicable.

[26] In oral argument Remington stressed this factor as the one of most importance; but this can hardly be true in a situation wherein the place of sale and purchase is a foreign country but both litigants are American citizens.

place of manufacture, the place from whence Remington made itself part of the overall enterprise which placed the defective shell into the stream of commerce. This would be chiefly Connecticut, where the plans were formulated and, to a degree, California, where some of the broad scale advertising was carried out.

In *Reich v. Purcell, supra,* 67 Cal.2d 551, 556, the court commented that: "Missouri [the place of the accident] is concerned with conduct within her borders and as to such conduct she has the predominant interest of the states involved." It would seem that if the issue involved here were active negligence, then conduct would be of paramount concern, and Mexico would become somewhat more important as the jurisdiction with the most significant interest in the resolution of that issue. ■ However, strict liability in tort is not concerned with such conduct. It is actually an expression of policy that once an entity is instrumental in placing a defective product (where there is no reasonable expectation that the consumer will inspect said product for defects prior to use) into the stream of commerce, then liability attaches without regard to conduct (fault). ■ The doctrine is only concerned with compensating the injured consumer on the theory that the enterprise is more able than the injured victim to sustain, because it can spread them, the burdens of the costs of injuries suffered as a result of the product's defect. (*Greenman v. Yuba Power Products, Inc., supra,* 59 Cal.2d 57, 63; *Vandermark v. Ford Motor Co., supra,* 61 Cal.2d 256, 261-263; *Barth v. B. F. Goodrich Tire Co., supra,* 265 Cal.App.2d 228, 251-253.)[27] As stated in a Comment entitled, *Products Liability and The Choice of Law,* 78 Harvard Law Review 1452, at page 1461, "The measure [strict liability in tort] seems most frequently aimed at assuring compensation for the injured user [and] at evaluating injuries in terms of money and spreading such costs upon the business enterprise and ultimately upon all purchasers of its products." At page 1466, the writer, viewing strict liability in tort primarily as a compensa-

---

[27]Note also the philosophy expressed in *Haft v. Lone Palm Hotel,* 3 Cal.3d 756, 775, footnote 20 [91 Cal.Rptr. 745, 478 P.2d 465]: "This result is also consistent with the emerging tort policy of assigning liability to a party who is in the best position to distribute losses over a group which should reasonably bear them. (See, e.g., *Price v. Shell Oil Co.* (1970) 2 Cal.3d 245, 251-252 . . . . See generally Calabresi, *Some Thoughts on Risk Distribution and the Law of Torts* (1961) 70 Yale L.J. 499.) In the instant case the defendant motel owner, and more generally the entire class of those who frequent defendants' motel, were, in an economic view, the beneficiaries of the 'cost savings' accompanying the nonemployment of a lifeguard. It is better that this entire group bear the burden of the loss resulting from this 'economy,' rather than to require one particular guest to absorb the entire loss. By assigning liability to the motel in those cases in which no direct evidence establishes causation, we make sure that all motel guests bear their fair share of these damages, since the motel owner is likely to treat either the costs of liability insurance, or the actual costs of litigation, as a direct expense of its business and establish its fees accordingly."

tory scheme, suggests, "A state or country may think itself responsible for the security of its citizens, *even when they are injured abroad;* it may, in pressing cases, have to care for the injured person or his dependents. One purpose for adoption of strict liability by the state of residence is no doubt to provide a satisfactory scheme of compensation for the injured, and applying its law when one of its citizens is the plaintiff would serve to further such a purpose." (Italics added.)

Where the real issue involved in a case is compensation of the injured person, California courts have tended to apply the law of the place of the injured's domicile, finding that that state has the greatest interest in compensating its domiciliaries. Thus in *Reich* v. *Purcell, supra,* 67 Cal.2d 551, the court refused to apply the Missouri limitation on damages for wrongful death to a case where, although the accident occurred in Missouri, plaintiffs' decedents had resided in Ohio and their estates were being probated there, stating, "Limitations of damages for wrongful death, however, have little or nothing to do with conduct. They are concerned not with how people should behave but with how survivors should be compensated. *The state of the place of the wrong has little or no interest in such compensation when none of the parties reside there."* (Italics added.) (See also: *Ryan* v. *Clark Equipment Co.*, 268 Cal.App.2d 679, 683 [74 Cal. Rptr. 329]; *Fuller* v. *Greenup,* 267 Cal.App.2d 10, 18 [72 Cal.Rptr. 531]; *Schneider* v. *Schimmels, supra,* 256 Cal.App.2d 366, 372-373.)

██ Although Mexico would have an interest in regulating its manufacturers in order to insure the safety of its citizens, which insurance incidentally might be protective of foreign visitors, Mexico cannot be said to have a comparable interest in compensating foreigners injured within its borders. This concept, of course, is not peculiar to Mexico or at odds with the principle of equal protection; it is simply that it is more significant to a given jurisdiction to have its own citizens redressed. Further, the fact that the manufacture, sale and use of the defective shell all occurred in Mexico diminishes in importance when it is remembered that no Mexican national is a party in this case.

*Ryan* v. *Clark Equipment Co., supra,* 268 Cal.App.2d 679, appears to be the only California decision which discusses the modern conflict of laws rules in strict liability situations. In that case the central issue was the proper choice of law regarding limitation of damages for wrongful death. However, the court did note that there was no authority for the proposition that the law of the place of manufacture is controlling in strict liability cases. (P. 682.) In deciding that the law of the place of plaintiff's residence should be applied with respect to the limitation of damages for wrongful death, the court concluded, "Oregon's interest in the compensa-

tion of her residents for wrongful death overrides any possible concern of Michigan [the place of manufacture of the defective product] in the regulation of the activities of manufacturers." (P. 683.) Just so, in the instant case, the interest California has in compensating its residents injured by defective products outweighs any interest Mexico may have in the regulation of its own manufacturers where no Mexican citizen is a party to the action and where Mexican law does not even recognize the doctrine of strict liability in tort or make provision for compensating an injured person for pain or suffering, both of which principles constitute the public policy of California. [28]

Further there is some evidence from which it might be inferred that the fact that the shell exploded in Mexico was more or less fortuitous. In *Tramontana v. S. A. Empresa De Viacao Aerea Rio Grandense, supra,* 350 F.2d 468, 472, the court in distinguishing *Kilberg v. Northeast Airlines, Inc.,* 9 N.Y.2d 34 [211 N.Y.S.2d 133, 172 N.E.2d 526], pointed out that the New York court in *Kilberg* would have the same interest in providing full compensation for the death of one of its own citizens whether the commercial aircraft in which decedent was a passenger crashed in New York where the flight originated or in Massachusetts where the accident happened, stressing the fact that the place of the accident was "merely

---

[28]Even when most jurisdictions accepted the law of the place of the wrong as the proper conflict rule in tort cases, courts still refused to apply foreign law when it was contrary to a strong public policy of the forum state. (*Kilberg v. Northeast Airlines, Inc.,* 9 N.Y.2d 34 [211 N.Y.S.2d 133, 172 N.E.2d 526, 528-529], and *Pearson v. Northeast Airlines, Inc.,* 309 F.2d 553, 559 [92 A.L.R.2d 1162].)

Although Remington accepted California as the forum so the issue between competing governmental entities was not one of forum judgments but of choice of law, some decisions in the former category have instructive aspects. In *Bryant v. Finnish National Airline,* 15 N.Y.2d 426 [260 N.Y.S.2d 625, 208 N.E.2d 439], a passenger who was a New York resident was injured in Paris by being struck by a baggage cart blown against her by a blast of air from the defendant's aircraft. Defendant's activities in New York were of a minimal nature (advertising, taking reservations, and giving out information). This case was commented upon in an article by Law Professor Aaron D. Twerski of Duquesne University, *The Jurisdictional Defense,* in 13 F.T.D. (Feb. 1972) p. 17 et seq. He says: "In the Finnish airline case, New York may have felt that to close the door of the New York courts to the plaintiff would mean to relegate him to a foreign [country] forum. The defendant, although involved in minimal activities in New York, was truly international in scope and should be able to foresee lawsuits arising from its travel activities affecting persons in many parts of the world. It was probably not unfair to force the defendant to litigate in New York." (P. 18.) The author then poses some hypothetical circumstances. One of them and his comment thereon is as follows: "Finally, if the defendant has acted outside the forum causing injury to the plaintiff outside the forum, the mere fact that plaintiff is a forum domiciliary and will return to the forum and that the effect of the injury or the consequence will be felt there is not, in and of itself, sufficient to give the forum due process jurisdiction over the defendant. [Fn. omitted.] . . . . ¶ However, if the defendant has been involved in other activity in the forum, there could be grounds for the assertion of jurisdiction. . . ." (P. 19.)

fortuitous." In *Tramontana, supra,* (wherein the foreign law was chosen), however, neither appellant nor her decedent were residents of the forum (Washington, D.C.) and the fatal flight was to have been a local flight, the place of origin and destination within Brazil. "The place of injury, under these circumstances, was clearly not fortuitous . . . ." (P. 472.) Like the forum state in *Kilberg,* California has an added interest in compensating its own residents where the place of injury is more or less fortuitous.

In the instant case, although the stream of commerce was Mexican oriented and there was the likelihood that plaintiff would fire the defective shell in Mexico as he did, plaintiff had proposed ending the shoot that day, and it appears that the party was near the end of its hunting jaunt. Plaintiff easily could have reserved the use of this particular shell and fired it sometime later when he was at home in California. Remington argues that this alternative cannot be considered on the ground that for plaintiff to have brought any unused CDM shotgun shells into the United States would have been in violation of federal laws restricting importation of munitions (Mutual Security Act of 1954, 22 U.S.C. § 1934, as supplemented by 22 C.F.R., § 121 et seq.), and articles with deceptive trademarks. (19 U.S.C. § 1526 as supplemented by 19 C.F.R., § 11.14 et seq.) Our analysis indicates that these rules would not apply to the unused and limited number of shotgun shells acquired by plaintiff. The individual and casual type transmission by plaintiff of a few unused CDM shotgun shells that might have occurred would not seem to fall within the contractual concept. However, assuming its relevancy, we note that the trademark license agreement between Remington and CDM did contemplate some exportation of merchandise, since it provided that as to ammunition manufactured for export CDM would "apply . . . a distinctive trademark approved by [Remington]." CDM did incorporate such a marking—two separated half circles stamped on the base of the shells (United States Remington shells had a continuous circle). The indicated contractual provision might be construed as the consent mentioned in that part of section 11.14(a) of title 19 of Code of Federal Regulations which states that: "The importation of merchandise of foreign . . . manufacture is prohibited if such merchandise bears a mark . . . which . . . simulates a trade-mark . . . recorded in the Treasury Department . . . unless such merchandise is imported . . . with the written consent of, the owner of the protected trade-mark." However, it is more plausible that the part of subdivision (b) would govern which states that "merchandise manufactured . . . in a foreign country . . . which . . . is recorded under the . . . trade-mark laws, shall not be deemed to . . . simulate such United States trade-mark . . . if such . . . trade-mark . . . and such United States trade-mark . . . are owned by the same . . . corporation." (P.

240.) Moreover, the entire coverage of section 11.14, as indicated by footnoted material in Code of Federal Regulations, seems aimed at dealers.

As to Remington's suggestion that such an incidental transmission of shells from Mexico to the United States would run afoul of the Mutual Security Act, we note that shotgun ammunition is excepted therefrom.[29]

Another factor which strengthens our conviction respecting the applicability of California law in this action is the fact that Remington, as a practical matter, is the only member of the enterprise available to plaintiff in California. ■ One of the policy considerations in developing the enterprisal concept of liability was the very reason that in some cases a manufacturer, or other logically suable component of an enterprise, would not be amenable to suit through lack of jurisdiction or other reason, by an injured plaintiff. (*Vandermark* v. *Ford Motor Co., supra,* 61 Cal.2d 256, 262.) ■ Where one of the integral members of the enterprise is amenable to California jurisdiction and the injured is a California citizen, California has a strong interest in insuring that that member bears the cost of such injuries and spreads it among his consumers, particularly when the law of the competing jurisdiction would afford no recovery to the injured California citizen.

■ Remington argues that it should not be considered part of the enterprise of which CDM, as manufacturer, would be the main component, because, under Mexican law, Remington was not allowed to be the dominating element of CDM, and because even its allowed minority interest was subject to expropriation. We are asked to take judicial notice of

---

[29]Pertinent excerpts from 22 Code of Federal Regulations "Part 121—ARMS, AMMUNITION, AND IMPLEMENTS OF WAR" are as follows:
"§ 121.01 The U.S. munitions list.
"Pursuant to the authority cited supra the following articles are hereby designated as arms, ammunition, and implements of war.

"CATEGORY I — FIREARMS
"(a) [S]hotguns with barrels less than 18 inches in length . . . .

"CATEGORY II — ARTILLERY AND PROJECTORS
" . . . . . . . . . . . . . . . . . . .

"CATEGORY III — AMMUNITION
"(a) Ammunition for the arms in Categories I and II . . . .
"(b) The following components . . . : [S]hells (excluding shotgun) . . . .
" . . . . . . . . . . . . . . . . . . .

"DEFINITIONS AND INTERPRETATIONS
"§ 121.04 Cartridge and shell casings
[After saying that these are included in Category II of the United States Munitions List unless rendered useless, this section states:]
" . . . (Shotgun ammunition is not included in the Munitions List.)"

certain foreign laws and even of acts of appropriation in Chile, but the pertinent portions of the laws have not been furnished. (Evid. Code, §§ 459, 453, subd. (b), and 454, subd. (b).) In any event, the items connecting Remington with the enterprise which did exist and which we have identified, in our estimation, were sufficient of themselves; the addition of controlling stock ownership was not necessary.

Remington contends that California should pay heed, in giving weight to this availability of a responsible defendant doctrine, to the possibility that the entity local to the United States (chosen to be sued) will push the expense of compensating such suitors over to the foreign component of the "enterprise," thus interfering with United States foreign policy to aid friendly, underdeveloped nations, if the foreign component was situated in such a country.[30] This probably is a feature which California should examine, but in the instant case the likelihood that Remington would funnel such expenses only to its foreign affiliate, even if it could contractually, and not spread them over its entire marketing and contractual spectrum is too remote.[31]

That an adjudication that California law should be chosen by a California forum, with the result that the theories of strict products liability and enterprise responsibility (with emphasis on the policy of thereby causing the sued entity to spread the cost of risk among all customers of the broad enterprise) would be applied, would cause a trademark licensor, such as Remington, to withdraw from or amend its arrangement to place a higher obligation on the licensee, or would chill the pursuit of a similar program by others, in frustration of the foreign policy of the United States to foster

---

[30] It is true that it is provided in the "regulations relating to . . . foreign trade" that "export controls . . . are used . . . [t]o further significantly the foreign policy of the United States and to fulfill its international responsibilities. . . ." (15 C.F.R., subtit. B, ch.3, pt. 370, § 370.1, subd. (a)(2)); and that the export from the United States of technical data (defined as information of any kind that can be used in the manufacture of articles) must be accomplished through license; and that in some respects Remington was engaged in that type of export. However, this appears to set no commanding reason why Mexican law should be chosen to govern litigation of the instant type where no Mexican entity or citizen will or can be the direct obligor of a compensatory award. Rather, it would be more of a reason for applying federal law or for removing the litigant to federal court, neither of which alternatives was sought by Remington.

[31] As noted, one tenet of the products liability doctrine is the point that its imposition causes the risk to be distributed broadly. It is reasonable to anticipate that Remington will distribute the risk which arises from the enterprise's introduction of Mexican manufactured ammunition into a stream of commerce (the happening of which brings Remington substantial remuneration) over its entire marketing spectrum (including the vast part over which it has price structuring power) and not shift it all to the foreign affiliate (by higher royalty figures when negotiating same might be possible) which caused a defective item to enter its stream of commerce.

economic growth in friendly nations in need thereof, is in our opinion, too remote to become the pivotal factor of choice of law in this case. What we do see in respect to the instant situation is that imposition of liability may cause Remington to make full use of its reserved right to inspect and control the quality of CDM production.

Remington points to the circumstance that the verdict of the jury was a general one, and it reasons that, therefore, the jury could have rested its verdict either on a finding of no agency (under which circumstances the giving of the erroneous instructions would have been an error prejudicial to plaintiff) or on a finding, granting agency or assuming properly given instructions, that the shotgun shell had been reloaded by McElroy. Remington refers to its proof tending to show that CDM's machinery was so set up that it could not have produced an overloaded shell, since it would shut down to prevent the introduction of too much powder.[32] It is doubtful whether such proof would be meaningful in a products liability case. Anyway, it mounted very little strength. We feel that there should be no presumption that the verdict rested on Remington's nonresponsibility for the overloading but rather that the existence of the alternative bases for the verdict rules out any possibility of a determination by us that the elements, other than participation-in-the-enterprise, foundational to the application of strict liability (which we listed above) were present as a matter of law which might have prompted a remand for the trial of damage issues only.

We affirm the trial court's decision with respect to choice of law, and thus we cannot find that plaintiff was not prejudiced by the erroneous instruction of the trial court.

With respect to our ruling on what is the scope of California's strict liability law, particularly the enterprise aspect, we stress the point that our decision is confined to the specific facts of this case, including, but not limited to the circumstances that Remington caused CDM to be formed, equipped and launched, that the accident occurred not long thereafter and while Remington still had implementing personnel at CDM, that Remington trained many of CDM's key employees who were Mexican nationals, that Remington had substantial stock ownership in CDM, was financing it through bonds and had common officers and directors, that Remington was receiving substantial revenue from its contractual status with CDM (established by the terms of the contracts and what was shown of the operations), that, in particular, Remington had rights of control over the

---

[32]Remington also alludes to plaintiff's testimony that he would bet that the shell had been reloaded by McElroy. The question which elicited this remark was withdrawn after objection, and it must be considered that the response went out of evidence with it. In any event, the remark was speculative; and speculation, even from the party against whom it operates, is of little value.

quality of CDM's product, that CDM's product closely resembled Remington-made units, that containers had to and did bear the legend, "manufactured in Mexico under contract with Remington . . . ," and that the foreign country involved had borders contiguous to California.[33]

The judgment is reversed and remanded for retrial consistent with the views expressed in this opinion.

Stephens, Acting P.J., concurred.

**AISO, J.,** Concurring and Dissenting.—I concur in judgment of reversal but respectfully dissent as to the basis for reversal. The threshold and pivotal issue in this case is what law is to be applied under the California law of conflict of laws. In this connection, it is important to bear in mind that factors pertinent to the choice of law question should be kept separate and apart from the factors relevant to the question of liability under the California law pertaining to products liability.

In this case (involving no personal relations, e.g., marital status or probate), the basic operative facts on the choice of law issue are: (1) place of manufacture, (2) place of sale, (3) place of injury, and (4) place of the injured person's residence. The locale of the first three factors is Mexico; the only contact with California is plaintiff's residence.

Under the so-called "center of gravity" or "The Most Significant Relationship Approach" (adopted by the Restatement Second of Conflicts of Law as noted by the majority), the applicable law is clearly that of Mexico. To weight the happenstance factor of residence over the other three results in a throwback to "personal law" and the perpetuation of the vestiges of the doctrine of extraterritoriality. (See: Comment (1965) 78 Harv.L.Rev. 1452, 1465.) This is not appropriate as clearly pointed out by the author of the California Law Review article discussed by the majority. Nor should we completely overlook the possibility that the law of an injured person's residence may or may not be favorable to his recovery. The so-called "governmental interest theory" has similar inherent weaknesses. Both theories generate uncertainties as to foreseeability of liability by potential defendants.

*Reich* v. *Purcell* (1967) 67 Cal.2d 551 [63 Cal.Rptr.31, 432 P2d 727] has not, in my opinion, definitely committed California to a "governmental interest theory." Neither the persons killed nor the plaintiffs in *Reich* were

---

[33]Also, we again stress that we see no meritorious difference between the facts in this case (the shell being used in Mexico) and a situation wherein the accident might have occurred in California.

residents of California at the time of the accident. It was not a case involving products liability.

` On the other hand, the majority do not espouse the adoption of a rule that the law most favorable to the plaintiff, whether he be a resident or a nonresident, a citizen or an alien, be applied.

The result reached by the majority can only be sustained upon the "governmental interest theory," which in areas such as welfare relief has been subject to erosion.

I would conclude that the trial court erred in selecting California law as the applicable law under the facts of this case and that the case should be retried applying the law of Mexico.

Respondent's petition for a hearing by the Supreme Court was denied May 31, 1972.